[No. B120052. Second Dist., Div. Four. Dec. 22, 1998.]

In re the Marriage of MARY L. and JON E. HOKANSON.
MARY L. PALMER, Appellant, v.
JON E. HOKANSON, Appellant.

**COUNSEL**

O'Connor & O'Connor, Timothy M. O'Connor, Colin O'Connor and Erin O'Connor for Appellant Wife.

Schenck & Edelman and Emily Shappell Edelman for Appellant Husband.

**OPINION**

**CURRY, J.**—Appellant Jon E. Hokanson and cross-appellant Mary L. Palmer challenge an order of the family court distributing the assets from the sale of the family house. We reverse in part, affirm in part, and remand.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

Jon and Mary were married on November 12, 1983.[2] They separated in October 1993, and Mary petitioned for dissolution of marriage.

In March 1994, Mary contacted RE/MAX Palos Verdes Realty, a real estate broker, and obtained a marketing analysis of the family house located in the Palos Verdes area from Agent Lynne Droubay. Droubay recommended listing the house at $525,000. In October and December 1994, Jon's attorney wrote to Mary's attorney, noting that Mary had indicated her willingness to sell the house, and asking that the house be listed for sale in January 1995.

Judgment of dissolution was filed on December 20, 1994. The judgment, inter alia, directed Jon to pay Mary $90,000 to equalize the division of community property, awarded Mary a separate property interest of $122,000 in the family house, ordered the house "to be sold as expeditiously as possible for the best price reasonably obtainable," and acknowledged Mary's occupancy of the house pending the sale.

In January 1995, Droubay told Mary that the market had weakened since she had given Mary the marketing analysis, and she recommended a listing price of $499,000. Shortly thereafter, Droubay, Mary, and Jon inspected the house, and Droubay advised them to make some minor repairs.

In June 1995, Mary asked Droubay to list the house at $529,000, despite Droubay's advice that this price was too high. No offers were received, and Droubay again recommended reducing the listing price. Mary instructed her to leave the price unchanged.

In August 1995, Mary wrote to Jon, telling him that she was taking the house off the market because she was undergoing treatment for breast cancer. She stated that she hoped to place the house on the market again "around the holidays."

In January 1996, Mary called Droubay and instructed her to list the house at $529,000. Droubay again told Mary that this price was too high. After Droubay communicated with Jon, Mary agreed to reduce the listing price to

---

[1]Following established principles of appellate review, the facts are recited here in the light most favorable to the judgment. (*Buehler* v. *Sbardellati* (1995) 34 Cal.App.4th 1527, 1531, fn. 1 [41 Cal.Rptr.2d 104].)

[2]We refer to the parties by their first names "to humanize a decision resolving personal legal issues which seriously affect their lives," and to make our opinion easier to understand. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475-476, fn. 1 [274 Cal.Rptr. 911].)

$499,000 in February 1996. In March 1996, Mary directed Droubay to remove the realtor's lock box from the house, but permitted Droubay to continue showing the house.

On April 16, 1996, Jon filed an ex parte application for an order to show cause, seeking an order directing Mary to list the house for $454,000 and to maintain a lock box on the house. On May 14, 1996, the house was listed by real estate Agents Janet Earl and Gunilla Windon of Coldwell Banker at a court-ordered price of $465,000.

In June 1996, Mary and Jon received an offer of $400,000 on the house. This was the first offer they had ever received. The house was sold for $430,000 on June 19, 1996.

On July 24, 1996, Mary filed an application for an order to show cause, seeking an order distributing proceeds from the sale. Jon opposed Mary's application and sought an order granting him relief for Mary's alleged breach of fiduciary duty under Family Code section 1101, including damages for losses due to the delayed sale and attorney fees.

Following hearings in March and April 1997, the family court found that Mary had breached her fiduciary duties by dilatory conduct, but declined to find she had acted in a manner that fell within the punitive damages provisions of Civil Code section 3294. The family court concluded: (1) had the house been listed for sale in January 1995, it would have sold within 60 days for the "reasonable net selling price" of $460,000; (2) as a result, the community had suffered a loss of $30,000, half of which was to be credited as an offset against Jon's equalization payment of $90,000; and (3) each party was to bear his or her own attorney fees.

The family court filed its statement of decision on December 31, 1997, and modified the statement of decision on February 26, 1998. This appeal and cross-appeal followed.

## DISCUSSION

### A. *Appeal*

Jon contends that (1) the family court erred in denying Jon's request for attorney fees, (2) insufficient evidence supports the family court's determination of the house's net sale price, and (3) the family court incorrectly calculated the credit due to Jon.

### 1. *Attorney Fees*

■ Jon contends that the family court improperly denied Jon an award of attorney fees to which he was entitled under Family Code section 1101, subdivision (g). We agree.

Under Family Code sections 721 and 1100, spouses have fiduciary duties to each other with respect to the management and control of community property. (Fam. Code, §§ 721, subd. (b), 1100, subd. (e).) When, as here, a spouse has breached her fiduciary duty, but not in a manner displaying fraud, malice, or oppression within the meaning of Civil Code section 3294, Family Code section 1101, subdivision (g), governs the applicable remedies. (Fam. Code, § 1101, subds. (g), (h).) Subdivision (g) provides that these remedies "*shall* include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty *plus* attorney's fees and court costs." (Italics added.)

Because the family court found that Mary had breached her fiduciary duty but not in a manner bringing her conduct within the ambit of Civil Code section 3294, the key issue here is whether the family court properly interpreted Family Code section 1101, subdivision (g) to give it the discretion to deny Jon's fee request.[3] We review this issue of statutory interpretation de novo. (See *Eidsmore* v. *RBB, Inc.* (1994) 25 Cal.App.4th 189, 195 [30 Cal.Rptr.2d 357].)

■ "The objective of statutory interpretation is to ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning. If those words are clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.] Whenever possible, we must give effect to every word in a statute and avoid a construction making a statutory term surplusage or meaningless. [Citations.]" (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437 [35 Cal.Rptr.2d 155].)

---

[3] In conclusory terms, Mary, as respondent, argues that Family Code section 1101, subdivision (g) is inapplicable to Jon's fee request on two grounds. Neither has merit.

First, Mary argues that Family Code section 1101, subdivision (g) is inapplicable because Jon had no equity interest in the house. However, Mary did not raise this theory before the family court. We decline to consider a theory unsupported by authority and raised in a manner that prevents Jon from developing the underlying facts. (*14859 Moorpark Homeowner's Assn.* v. *VRT Corp.* (1998) 63 Cal.App.4th 1396, 1403, fn. 1 [74 Cal.Rptr.2d 712].)

Second, Mary argues that substantial evidence does not support the family court's determination that she breached her fiduciary duty because there is no evidence that Mary instructed Droubay not to communicate with Jon. However, Family Code sections 721 and 1100 impose a fiduciary duty to Jon directly *on Mary*, and there is ample evidence in the record that she delayed the sale and failed to communicate information to Jon.

Here, the language of Family Code section 1101, subdivision (g) is unambiguous and mandatory. " 'It is a well established rule of statutory construction that the word "shall" connotes mandatory action and "may" connotes discretionary action.' [Citation.]" (*In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1039 [31 Cal.Rptr.2d 749].) Accordingly, the family court lacked discretion to deny Jon's fee request. (*Ibid.*)

This conclusion receives additional support from subdivision (h) of Family Code section 1101, which provides that when the pertinent breach of fiduciary duty falls within the ambit of Civil Code section 3294, the "[r]emedies . . . shall include, *but not be limited to,* an award to the other spouse of 100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty." (Italics added.) The clear import of the language in subdivision (h) is that an award of attorney fees is discretionary, over and above the mandatory award of the entire asset at issue. Accordingly, had the Legislature intended to consign an award of attorney fees to the family court's discretion under subdivision (g), it could have done so in plain terms. (*State Farm Mut. Auto. Ins. Co.* v. *Department of Motor Vehicles* (1997) 53 Cal.App.4th 1076, 1082 [62 Cal.Rptr.2d 178].)

Mary contends that the word "shall" in Family Code section 1101, subdivision (g) should not be understood as mandatory language because other Family Code provisions concerning attorney fees consign fee awards to the family court's discretion. However, we decline to depart from clear statutory language that neither produces an absurdity nor defeats the goals of section 1100 et seq. (*Unzueta* v. *Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1700 [8 Cal.Rptr.2d 614] ["[E]xcept in the most extreme cases where legislative intent and the underlying purpose are at odds with the plain language of the statute, an appellate court should exercise judicial restraint, stay its hand, and refrain from rewriting a statute to find an intent not expressed by the Legislature."].)

Mary also suggests that the legislative history of Family Code section 1101 supports her interpretation of subdivision (g), and she requests that we take judicial notice of this history.[4] We decline to rewrite section 1101 on the basis of this history. When the language of a statute is clear and unambiguous, we do not resort to extrinsic indicia of the Legislature's intent. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; *City of Sacramento* v. *Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 794 [27 Cal.Rptr.2d 545].)

In sum, the family court erred in denying Jon's attorney fee request under Family Code section 1101, subdivision (g).

---

[4]We hereby grant the parties' joint request for judicial notice of this history. (Evid. Code, §§ 452, 459.)

## 2. *Net Sale Price*

Jon contends that substantial evidence does not support the family court's finding that the "reasonable net selling price" of the house in early 1995 would have been $460,000. We disagree.

On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. (*In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 548 [251 Cal.Rptr. 370].) We accept all evidence favorable to the prevailing party as true and discard contrary evidence. (*Ibid.*)

At trial, Droubay testified that she calculated the "adjusted average sales price" of the house to be $485,866 in January 1995. Windon testified that the fair market value of the house at that time was between $475,000 to $480,000. Jon testified that Droubay's initial commission was to be 6 percent of the sales price, and that this was later reduced to 5 percent before June 1995. Finally, admitted into evidence was an accounting for the June 1996 sale which discloses that, aside from commissions, the sale involved title and escrow charges of approximately $3,000. The family court concluded that Droubay's testimony about the "adjusted average sales price" concerned the house's fair market value, and it found that the net sales price of the house in early 1995 would have been $460,000, explaining that this was a "netted-out" figure adjusted for "cost of sale," especially the broker's commission.

In our view, a trier of fact could have reasonably inferred that the house's net or adjusted sales price fell within a price range containing $460,000 as a possible value, depending on the estimated broker's commission and on whether adjustments were made for sales costs other than this commission. There is thus substantial evidence to support the finding that the net sales price of the house in early 1995 would have been $460,000.

## 3. *Credit*

Finally, Jon contends that the family court erred in calculating the credit to which he was entitled under Family Code section 1101, subdivision (g). We agree.

Here, the trial court concluded that the loss to the community due to Mary's delay was $30,000, based on an adjusted sales price of $460,000 in early 1995, and the eventual—but *unadjusted*—sales price of $430,000 in June 1996. This was error. In our view, the trial court, having determined the

net or adjusted sales price in early 1995, should have calculated the loss using a similarly adjusted sales price for June 1996.

Although the record contains a detailed accounting for the June 1996 sale, we cannot determine the loss to the community based on the finding about the adjusted or net sales price for early 1995 because the family court did not clarify whether it had adjusted this price for sales costs other than the broker's commission. Accordingly, the matter must be remanded to the family court to determine the appropriate adjusted or net sales price for the June 1996 sale, to calculate the loss in terms of the adjusted or net sales prices for early 1995 and June 1996, and to ascertain thereupon the credit to which Jon is entitled as an offset against his equalization payment.

### B. *Cross-appeal*

█ Mary's key contention in her cross-appeal is that the trial court improperly allowed Windon to provide expert testimony on the house's fair market value in early 1995.[5] She is wrong.

As the court explained in *Douglas* v. *Ostermeier* (1991) 1 Cal.App.4th 729, 738 [2 Cal.Rptr.2d 594], whether a witness is qualified to testify as an expert on the value of real estate is within the sound discretion of the trial court. In *Douglas,* the court concluded that the trial court did not abuse its discretion in permitting a realtor to testify as to the value of commercial property, even though the realtor primarily sold residential property and had not conducted a comparative market analysis of the property at issue, when the realtor had 10 years' experience as an agent, 2 years' experience as a broker, some experience selling commercial property, and familiarity with the property at issue. (*Id.* at pp. 737-739.) Similarly, in *Lakenan* v. *Lakenan* (1967) 256 Cal.App.2d 615, 619 [64 Cal.Rptr. 166], the court held that the trial court did not err in permitting a realtor to testify as to the value of three motels when the realtor had sold two of the motels, was familiar with the third, and had extensive experience selling motels.

Here, as in *Douglas* and *Lakenan,* Windon had extensive experience selling residences in the Palos Verdes area and she was familiar with the house in question. Windon testified that she had been a real estate agent since 1984, that she had received specialized training, that she was consistently one of the top salespersons in her office, that she worked exclusively

---

[5]Without citation to authority or sustained argument, Mary also suggests in her cross-appellant's brief that the trial court erred in treating Droubay's testimony concerning the house's "adjusted average sales price" in early 1995 as evidence of its fair market value. Mary did not file a cross-appellant's reply brief. Accordingly, the contention is waived. (*In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 278 [268 Cal.Rptr. 83].)

in the Palos Verdes area and had seen thousands of homes in that area, and that she was familiar with the house in question. There was no abuse of discretion.

Mary argues for the contrary conclusion, citing *Leslie G.* v. *Perry & Associates* (1996) 43 Cal.App.4th 472 [50 Cal.Rptr.2d 785], *Exxon Corp.* v. *Superior Court* (1997) 51 Cal.App.4th 1672 [60 Cal.Rptr.2d 195], and *In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308 [285 Cal.Rptr. 479]. Each of these cases is factually distinguishable. (*Leslie G.* v. *Perry & Associates,* *supra,* at pp. 479, 487-488 [expert's testimony that absence of security measures in apartment building contributed to rape is not substantial evidence concerning causation when there is no evidence about how rapist gained entry into building]; *Exxon Corp.* v. *Superior Court, supra,* at pp. 1682-1683 [expert's testimony about wholesale market for gasoline does not raise triable issue of fact about retail market for gasoline]; *In re Marriage of Czapar, supra,* at pp. 1313-1316 [expert's testimony cannot establish value of hypothetical future covenant not to compete].)

In sum, the trial court did not err in allowing Windon to provide expert testimony on the house's fair market value in early 1995.

## DISPOSITION

The order of the family court is reversed with respect to the rulings on Jon's request for attorney fees and the amount of his credit under Family Code section 1101, subdivision (g), and the matter is remanded to the trial court to determine in accordance with this opinion (1) Jon's attorney fees and court costs, (2) the net sales price of the family house in June 1996, (3) the loss based on the net sales prices for the family house in early 1995 and in June 1996, and (4) the credit to be allowed Jon as an offset against his equalization payment. The order is affirmed in all other respects. Jon is awarded his costs.

Vogel (C. S.), P. J., and Epstein, J., concurred.