[No. B214824. Second Dist., Div. One. Jan. 28, 2011.]

In re the Marriage of SANDRA and EDWARD FOSSUM.
SANDRA FOSSUM, Respondent, v.
EDWARD FOSSUM, Appellant.

338

COUNSEL

Law Offices of Richard A. Marcus and Richard A. Marcus for Appellant.

Law Offices of Martin S. Bakst and Martin S. Bakst for Respondent.

OPINION

**JOHNSON, J.**—Appellant Edward Fossum and his ex-wife, respondent Sandra Fossum, purchased a house in 1994. To obtain the best interest rate, the property was purchased in Edward's[1] name alone, but later title was placed in both spouses' names. In 1998, the parties agreed to enter into the

---

[1] We refer to the parties by their first names for the sake of clarity and ease of reference. We intend no disrespect.

same arrangement in order to obtain a good interest rate on a loan to refinance their home. Sandra quitclaimed her interest in the property to Edward, but he never restored Sandra's name to the title. Following trial in this action, the trial court determined the house was community property. Edward contends that ruling was in error. We affirm.

Prior to the parties' separation, Sandra took a cash advance on a credit card of $24,000, but never disclosed the transaction to Edward. The trial court found Sandra had breached her statutory fiduciary duty to her spouse. (Fam. Code, § 721, subd. (b).)[2] Edward contends the trial court erred when it refused to award him attorney fees, which are mandated under section 1101, subdivision (g), for Sandra's fiduciary violation. On this point, we conclude Edward is correct.

## FACTUAL AND PROCEDURAL BACKGROUND

Edward and Sandra Fossum were married in September 1994, after having lived together since 1992. They separated in November 2002.[3] The parties had no children together, although Sandra had a minor child from a prior relationship. Sandra filed a petition for dissolution in January 2003. Trial was conducted on various dates during February, March, June and October 2007. The primary dispute at trial, and on appeal, involves the characterization of real property located at 21557 Placerita Canyon Road, Santa Clarita (the property, or house). Escrow on the property closed in October 1994. The downpayment on the property was between $30,000 and $38,000. The funds for the downpayment came from the Fossums' joint savings account.

*The first quitclaim deed*

*Sandra's testimony*

At trial, Sandra testified that the source of the downpayment funds was money she and Edward earned together working in Edward's construction business during 1994, repairing homes after the Northridge earthquake. Sandra worked primarily as a "laborer," laying floors, repairing cracks, working on stone, and assisting Edward with design work and shower, kitchen and complete home remodels. She and Edward traveled together to and from work each day. The funds had been kept in a savings account that previously belonged to Edward. Sandra's name was added to the account after the marriage.

---

[2] Unless stated otherwise, all statutory references are to the Family Code.

[3] The once-disputed date of separation, among other issues, having been determined by the trial court and not raised on appeal, is no longer at issue.

In October 1994, Sandra first saw the house and she and Edward decided to buy it. They discussed how to take title to the property. Edward had a better credit rating than Sandra. Because of that, a lender recommended, and Edward and Sandra agreed, that Edward should finance the house and take title to the property in his name, in order to obtain a better interest rate than the one for which they could qualify if Sandra's name was also on the title. Edward recommended that Sandra execute a quitclaim deed in his favor and promised Sandra that, once the loan closed, he would deed the house back to Sandra so that title would be in both of their names. Sandra believed Edward and agreed to this arrangement.

Sandra signed a quitclaim deed in favor of Edward on October 17, 1994 (the first quitclaim deed). A grant deed executed on October 27, 1994, and recorded in January 1995, shows title to the residence taken in the name of Edward Fossum, a married man, as his sole and separate property.

*Edward's testimony*

. Edward did not recall having discussed with Sandra the issue of the manner in which title to the property would be taken in 1994. The loan was intended to be in his name alone because his credit was better and because the funds used for the downpayment were earned by Edward in his construction business during 1994. The funds used for the downpayment were transferred from Edward's separate accounts into a savings account to which Sandra's name had been added after the marriage. Edward and Sandra also combined their checking and credit card accounts after they married.

*The second quitclaim deed*

*Sandra's testimony*

After the loan closed in October 1994, Edward kept his promise and executed a quitclaim deed, dated August 16, 1995, in favor of Edward and Sandra Fossum, as joint tenants (the second quitclaim deed). Edward gave this deed to Sandra, and told her he was doing so based on their earlier discussion. Sandra and Edward went to the notary together at the time the second quitclaim deed was signed, and later sent it to be recorded. For reasons unimportant here, the deed was not recorded until January 28, 1997.

*Edward's testimony*

After escrow closed in 1994, Edward executed the second quitclaim deed, placing the property into both his name and Sandra's, and took it to be notarized. Edward did not recall whether he and Sandra had agreed whether

the handwritten deed should be recorded. Edward was not aware the hand-written deed had been recorded until this action was initiated, and his attorney instructed him to obtain title documents. Edward was not, however, surprised when someone from the bank requested a quitclaim deed from Sandra to complete a refinance transaction in 1998.

### The refinance and third quitclaim deed

#### Sandra's testimony

In 1998, Sandra and Edward discussed obtaining a fixed, lower interest rate by refinancing the property. Edward told Sandra that because her credit history remained a problem, they should do the same thing they had done when they first bought the house, in order to obtain a better interest rate. Sandra and Edward agreed to refinance the property in Edward's name alone and that, just as before, Edward would restore Sandra's name to the title once the transaction was complete. Sandra believed Edward, and signed a quit-claim deed in his favor in May 1998 (the third quitclaim deed). Sandra, who had taken a real estate course during the marriage, knew the document she signed was a quitclaim deed, and understood what the document meant when it stated she was conveying title to Edward as his sole and separate property. Sandra would not have executed the third quitclaim deed if Edward had told her that he intended that the house would remain his separate property. After the refinance was completed, Sandra asked Edward several times to return title to the property to both of their names, and Edward said he would. But, Sandra and Edward "got busy," and Edward never got around to executing a new quitclaim deed. By 2002, the marriage was in trouble and, at Edward's urging, the couple was undergoing counseling. At that point, Edward condi-tioned his willingness to return Sandra's name to the title on a list of requirements that she "behave" in a certain way, and become a "Godly woman and a good Christian wife," with a "heart . . . free of sin." It was not until after Sandra moved out of the house that Edward told Sandra he would not, under any circumstances, put her name back on the title.

#### Edward's testimony

Sandra and Edward jointly applied for a loan to refinance the house. However, once Edward realized he could qualify for the loan without Sandra, he removed her name from the loan application. Sandra voluntarily executed the third quitclaim deed. While the Fossums lived together, mortgage pay-ments on the house were made from a community checking account.

#### Sandra's undisclosed cash advance

In spring 2002, prior to the parties' separation, Sandra took a $24,000 cash advance on a credit card, and transferred the funds into her personal bank

account. She claimed she needed the funds for living expenses because Edward refused to give her any money to pay bills. Edward agreed that as of February 2002, he stopped paying any bills that benefited Sandra directly. Edward claimed Sandra used about $13,500 of the cash advance funds, without his permission or knowledge, to purchase a horse trailer and a car for her son.

In January 2009, the trial court issued its judgment. The court found that the house, purchased during the marriage, was presumptively community property. (§ 760.) The court further found that Edward, who claimed the house was his separate property in which Sandra had only a " 'Moore/Marsden' " interest,[4] had failed to produce sufficient evidence to rebut the community property presumption. The court also found that Sandra had violated her statutory fiduciary duty to Edward, under section 721, when she took the undisclosed cash advance. Pursuant to section 2030, the court ordered Edward to pay Sandra $20,000, as his contributive share of her attorney fees. The court rejected Edward's request for attorney fees based on Sandra's violation of section 721. Edward appeals.

### DISCUSSION

Edward's principal assignments of error are that the trial court erroneously characterized the house as community property, and that he was unjustly denied attorney fees under section 1101, subdivision (g).

1. *Characterization of the property*

    a. *The initial property acquisition*

The first issue before us is whether the trial court correctly found that the house was community property when it was acquired.

The Fossums purchased the house during their marriage. To obtain a more favorable interest rate on the mortgage, Sandra quitclaimed her interest in the house to Edward, and the property was acquired in his name alone. The first quitclaim deed was validly executed and recorded. Sandra testified that she understood and agreed the house would be acquired solely in Edward's name, but believed Edward when he told her that she would be added to the title at a later date. Edward kept that promise, and later executed the handwritten second quitclaim deed placing the property in his name and Sandra's, as joint tenants. A few years later, the Fossums wanted to refinance. They agreed

---

[4] Referring to *In re Marriage of Moore* (1980) 28 Cal.3d 366 [168 Cal.Rptr. 662, 618 P.2d 208], and *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426 [181 Cal.Rptr. 910].

Sandra would again execute a quitclaim deed in favor of Edward, so he could refinance the house in his name alone to obtain a lower interest rate. Sandra agreed to execute the third quitclaim deed, and understood what she was doing. However, she only signed the third quitclaim deed for the same reason and under the same conditions as when she had executed the first quitclaim deed—she believed her husband would make good on his promise to return title to the property to both spouses' names, once the refinancing transaction was complete.

■ Subject to statutory exceptions not relevant here, all property acquired during marriage is presumptively community property. (§ 760; *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 12 [99 Cal.Rptr.2d 252, 5 P.3d 815] (*Bonds*).)

Here, the Fossums purchased the house during their marriage, and the trial court found the house was community property when acquired. Although Edward takes issue with the latter factual finding, substantial evidence supports the court's conclusion.

Sandra testified that the source of the downpayment funds, which came from cashier's checks drawn on the Fossums' joint savings account, was money she and Edward earned together performing home construction and repairs in 1994. Edward claimed the source of the downpayment came from his separate property accounts, and was merely transferred into the parties' joint account to expedite the purchase transaction. Edward was unable to substantiate this claim. He attributed his inability to do so to his claim that Sandra had taken all his bank records when she moved out of the house, and refused to return them. Edward testified his bank informed him it kept such records for 10 years. Although the timeframe between the home purchase and this dissolution action was within that timeframe, Edward failed to obtain bank records or to produce evidence to rebut Sandra's testimony. The trial court did not find Edward credible. The record supports that conclusion. The house was community property when acquired.

### b. *The effect of the 1998 transaction*

Neither party disputes the validity of the 1995 interspousal transaction in which Edward executed the second quitclaim deed placing title in his name and Sandra's, as joint tenants. At this point, the house was clearly community property. Thus, the next issue is the effect of Sandra's execution of the third quitclaim deed placing title to the property in Edward's name, as his "sole and separate property."

■ Spouses have the right to enter into property-related transactions with each other. (§ 721, subd. (a).) However, spouses occupy a confidential and

fiduciary relationship with each other. (§ 721, subd. (b).) The nature of this relationship "imposes a duty of the highest good faith and fair dealing" on each spouse as to any interspousal transaction. (*Ibid.*) "If one spouse secures an advantage from the transaction, a statutory presumption arises under section 721 that the advantaged spouse exercised undue influence and the transaction will be set aside." (*In re Marriage of Mathews* (2005) 133 Cal.App.4th 624, 628–629 [35 Cal.Rptr.3d 1] (*Mathews*); see *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293–294 [39 Cal.Rptr.2d 673] (*Haines*).) Generally speaking, if an interspousal transaction results in one spouse obtaining an advantage over the other, a rebuttable presumption of undue influence will attach to the transaction. (*Bonds, supra*, 24 Cal.4th at pp. 27–28; *In re Marriage of Delaney* (2003) 111 Cal.App.4th 991, 996 [4 Cal.Rptr.3d 378].)

" 'When a presumption of undue influence applies to a transaction, the spouse who was advantaged by the transaction must establish that the disadvantaged spouse's action "was freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of the effect of" the transaction.' [Citation.]" (*In re Marriage of Lund* (2009) 174 Cal.App.4th 40, 55 [94 Cal.Rptr.3d 84].) The advantaged spouse must show, by a preponderance of evidence, that his or her advantage was not gained in violation of the fiduciary relationship. (*Haines, supra*, 33 Cal.App.4th at p. 296.) " 'The question "whether the spouse gaining an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence." ' [Citation.]" (*Lund*, at p. 55.)

Here, the trial court found Edward failed to rebut the presumption of undue influence. Edward contends that the trial court erred by failing to adhere to the rule that the "form of title" in the third quitclaim deed must control over Sandra's claim of the existence of an oral agreement contradicting that instrument.

Under the "form of title" presumption, the description in a deed as to how title is held presumptively reflects the actual ownership status of the property. (*In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 184–185 [86 Cal.Rptr.3d 624] (*Brooks*); *Haines, supra*, 33 Cal.App.4th at p. 292.) This common law presumption is codified in Evidence Code section 662, which states, "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." The presumption is based on the promotion of a public policy that favors the stability of titles to property. (*Brooks*, at p. 185.) Accordingly, absent a showing to the contrary, the status declared by the instrument through which a party acquired title will control. (*Ibid.*; see generally Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter

Group 2010) ¶ 8:32, p. 8-9 (rev. # 1, 2010).) As the court in *Brooks* observed, "[t]he presumption can be overcome only by evidence of an agreement or understanding between the parties that the title reflected in the deed is not what the parties intended." (*Brooks*, at p. 189.)[5]

The problem with Edward's argument is that it essentially ignores the rule that the form of title presumption simply does not apply in cases in which it conflicts with the presumption that one spouse has exerted undue influence over the other. (*Brooks, supra,* 169 Cal.App.4th at p. 190, fn. 8; *Haines, supra,* 33 Cal.App.4th at pp. 301–302.) That is the factual scenario addressed in the trial court, and the record we review. Although Edward contends there is insufficient evidence that he exerted any undue influence over Sandra, the trial court found otherwise. We resolve the action in light of that factual finding.

The statutory presumption of undue influence applies if (1) there is an interspousal transaction by which (2) one spouse gains an advantage over the other. (§ 721; *Mathews, supra,* 133 Cal.App.4th at p. 629.) Those prerequisite elements are satisfied here with regard to the third quitclaim deed. Thus, Edward bore the burden to establish, by a preponderance of evidence, that Sandra's signing of the third quitclaim deed was freely and voluntarily made with full knowledge of all the facts and with a complete understanding of its effect of making the house Edward's separate property. (133 Cal.App.4th at pp. 630–631.) Substantial evidence supports the trial court's finding that Edward failed to carry this burden.

Sandra did testify she executed the third quitclaim deed freely and voluntarily, and that she understood the legal import of a quitclaim deed. However, when Sandra agreed to deed her interest in the property to Edward, she did so based on his promise to restore her name to the title once the refinance was complete. She now claims the transaction was predicated on a false promise that Edward never intended to fulfill. Edward maintains Sandra never raised this argument below and that, to date, she has argued only that he reneged on a promise to put her name back on the title. There is a semantic distinction. But here it is a distinction without a difference. The pivotal point is that Sandra consistently believed she jointly owned the property with her husband, and would never have agreed to sign the quitclaim deed had she known Edward either believed otherwise, or that he never intended to fulfill his promise and employ the same procedure the couple

---

[5] Significantly, when it applies, the form of title presumption may not be "rebutted by evidence that title was taken in a particular manner merely to obtain a loan." (*Brooks, supra,* 169 Cal.App.4th at p. 190; cf. *In re Marriage of Kahan* (1985) 174 Cal.App.3d 63, 69 [219 Cal.Rptr. 700] [when title was taken by spouses as joint tenants to obtain loan, property was presumptively held in joint tenancy].)

used when they acquired the property in order to keep it for himself. Undue influence consists, among other things, "[i]n the use, by one in whom a confidence is reposed by another . . . , of such confidence . . . for the purpose of obtaining an unfair advantage over him." (Civ. Code, § 1575.) Contrary to Edward's assertions, Sandra was not required to show fraud, or deceit or that he overtly or implicitly threatened her to get her to sign the deed. The spouses jointly wished to refinance their mortgage to obtain a fixed rate at the best possible interest rate. To do so, they agreed it benefitted them to obtain the loan in Edward's name. Accordingly, they agreed to engage in a repeat performance of the identical interspousal transaction once before completed without negative incident. However, the second time around, Edward either never intended to restore Sandra's name to the title, or refused to do so after she failed to comport herself in the way he believed his wife should "behave." Whatever the reason, the record contains sufficient evidence in the record to support the trial court's finding that Edward abused his position as Sandra's fiduciary and confidant, and failed to deal with his spouse in the highest good faith. Hence, he failed to rebut section 721's presumption of undue influence. The house is community property.

## 2. *No separate property reimbursement for downpayment*

Edward takes issue with the trial court's failure to "make any determination about the separate property contributions to the downpayment." We reject Edward's argument because the record shows he did not specifically object to the proposed statement of decision on the basis that the trial court did not apportion his alleged separate property contribution to the downpayment. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134 [275 Cal.Rptr. 797, 800 P.2d 1227]; *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380 [25 Cal.Rptr.2d 242] ["any defects in the trial court's statement of decision must be brought to the court's attention through specific objections to the statement itself . . ."].) Because he did not raise the issue in the trial court, Edward forfeited his right to complain on appeal about the trial court's lack of specificity.

In any event, even if the objection was not forfeited, the record supports a contrary conclusion. The trial court specifically noted it had considered all the evidence. That evidence includes conflicting testimony as to whether the source of the funds drawn on the parties' joint bank account came from their joint earnings working in Edward's construction business in 1994, or was solely the fruit of Edward's efforts and savings. The trial court found Sandra credible, and determined that Edward was not entitled to any separate property contribution for the downpayment.

### 3. *Attorney fees for violation of fiduciary duty*

Edward contends the trial court improperly denied him an award of attorney fees to which he was entitled under section 1101, subdivision (g). We agree.[6]

Under sections 721 and 1100, spouses have fiduciary duties to each other as to the management and control of community property. (§§ 721, subd. (b), 1100, subd. (e).) When, as here, the trial court finds a spouse has breached her fiduciary duty, but not in a manner rising to the level of sanctionable conduct under section 271, nor by conduct rising to the level of fraud, malice, or oppression, section 1101, subdivision (g), governs the applicable remedies. (§ 1101, subds. (g), (h).) That subdivision states that its remedies "*shall include,* but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty *plus* attorney's fees and court costs." (§ 1101, subd. (g), italics added.)

Before the parties' separation, Sandra charged $24,000 to a credit card without disclosing the charge to her husband. Although the parties disputed the use to which those funds were put, it was undisputed that Sandra incurred the debt without disclosure to Edward, in violation of her fiduciary obligations to her spouse and the provisions of section 721. The trial court ordered Sandra to reimburse half the charged amount ($12,000) to Edward, but did not award Edward any attorney fees. Edward filed an objection to this order. In its statement of decision, the court rejected Edward's objection, observing that, while it was aware more severe remedies were available, in its view the remedy was in accord with section 1101, subdivision (g). The court was mistaken.

Because the family court found that Sandra breached her fiduciary duty, but that her conduct did not rise to the level warranting an award of attorney fees as sanctions under section 271, the key question is whether the trial court properly interpreted section 1101, subdivision (g) as vesting it with the discretion to deny an award of fees to Edward. This issue, which is one of statutory interpretation, is reviewed de novo. (See *Eidsmore v. RBB, Inc.* (1994) 25 Cal.App.4th 189, 195 [30 Cal.Rptr.2d 357].)

"The objective of statutory interpretation is to ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning. If those words are

---

[6] Edward does not dispute the court's power to award Sandra attorney fees under section 2030. Sandra's appellate brief focuses only on the needs-based attorney fee award, and fails to address the issue of whether Edward is entitled to attorney fees under section 1101 at all.

clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.] Whenever possible, we must give effect to every word in a statute and avoid a construction making a statutory term surplusage or meaningless. [Citations.]" (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437 [35 Cal.Rptr.2d 155].)

The language of section 1101, subdivision (g) is unambiguous and mandatory. " ' "It is a well established rule of statutory construction that the word 'shall' connotes mandatory action and 'may' connotes discretionary action." [Citation.]' " (*In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 993 [80 Cal.Rptr.2d 699] (*Hokanson*).) Once a breach is shown, the trial court lacks discretion to deny an aggrieved spouse's request for attorney fees. (See *In re Marriage of Brewer & Frederici* (2001) 93 Cal.App.4th 1334, 1344 [113 Cal.Rptr.2d 849] [a spouse's statutory fiduciary duty of care arises "without reference to any wrongdoing"].) Accordingly, the trial court lacked discretion to deny Edward's fee request. (*Ibid.*)[7] The trial court erred when it denied any award to Edward for attorney fees attributable to Sandra's violation of section 721.[8] The matter must be remanded to permit the trial court to determine the amount of attorney fees to which Edward is entitled, under section 1101, subdivision (g), due to Sandra's violation of section 721.

---

[7] "This conclusion receives additional support from subdivision (h) of Family Code section 1101, which provides that when the pertinent breach of fiduciary duty falls within the ambit of Civil Code section 3294, the '[r]emedies . . . shall include, *but not be limited to*, an award to the other spouse of 100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty.' (Italics added.) The clear import of the language in subdivision (h) is that an award of attorney fees is discretionary, over and above the mandatory award of the entire asset at issue. Accordingly, had the Legislature intended to consign an award of attorney fees to the family court's discretion under subdivision (g), it could have done so in plain terms. [Citation.]" (*Hokanson, supra*, 68 Cal.App.4th at p. 993.)

[8] We are aware that, although both parties sought attorney fees in this action, Edward never specifically requested an award of attorney fees for Sandra's violation of section 721. Following trial, in October 2007, the court ordered the parties to submit their respective closing arguments, and agreed to set up a conference call to determine if either party wanted additional time for his or her closing argument. The court also ordered that "the issue on attorney fees [would] be bifurcated after that." In his closing argument, filed December 10, 2007, Edward noted the court had reserved the issue of attorney fees for a later date. Notwithstanding this reservation, the trial court proceeded to address the question of attorney fees in its tentative decision in March 2008, and invited the parties to file objections. On April 9, 2008, Edward filed written objections to the trial court's tentative decision. He noted he had objections to the court's ruling as to attorney fees, but did "not brief the issue . . . as [the court] intended to have a hearing over this issue." Edward requested that a hearing be conducted so that he could "expand upon [his] objection." The court apparently conducted a further hearing on the parties' objections in July 2008, after which it issued a final ruling rejecting Edward's assertions. The record does not contain a transcript of the July 2008 hearing. Neither the final ruling nor the judgment addresses the court's resolution of the issue of Edward's entitlement to attorney fees under section 1101, subdivision (g).

## DISPOSITION

The matter is remanded to the trial court to conduct a hearing to determine the amount of attorney fees to which Edward is entitled, under Family Code section 1101, subdivision (g), due to Sandra's violation of Family Code section 721, subdivision (b). In all other respects, the judgment is affirmed. Each party shall bear his or her own costs of appeal.

Chaney, J., concurred.

**ROTHSCHILD, Acting P. J.,** Concurring and Dissenting.—I concur in the majority opinion except for part 3. of the Discussion, from which I respectfully dissent.

Assuming that Family Code section 1101, subdivision (g), does provide for a mandatory award of attorney fees, the statute is not self-executing (and the majority does not hold that it is self-executing).[1] If Edward did not ask the trial court for an award of attorney fees pursuant to that statute, then he cannot complain on appeal of the trial court's failure to give him one. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 826 [79 Cal.Rptr.3d 588]; *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 1002 [64 Cal.Rptr.2d 383].) It is Edward's burden, as appellant, to provide us with a record sufficient to demonstrate his entitlement to relief. (*Rancho Santa Fe Assn. v. Dolan-King* (2004) 115 Cal.App.4th 28, 46 [8 Cal.Rptr.3d 614].) Nothing in the record on appeal shows that Edward ever asked the trial court for an award of attorney fees pursuant to section 1101, subdivision (g). It is possible that he requested such an award orally at the hearing in July 2008, but he did not provide us with a transcript of that hearing. As appellant, Edward must bear the consequences of that failure. I therefore disagree with the majority's decision not to treat the issue as forfeited. We should affirm the trial court's decision not to award attorney fees in connection with Sandra's breach of fiduciary duty.

I note in addition that section 1101, subdivision (g), is anomalous in several respects. First, I know of no other Family Code provision calling for a mandatory award of attorney fees. In general, attorney fee awards in marital dissolution actions are discretionary and based on need and ability to pay. (See §§ 2030–2032; *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 629–630 [108 Cal.Rptr.2d 833].) Even fee awards imposed as sanctions are discretionary. (See § 271.) Second, as interpreted in the case law, subdivision (h) of section 1101 provides for a *discretionary* award of attorney fees based on conduct amounting to fraud, oppression, or malice, while subdivision (g) of

---

[1] All subsequent statutory references are to the Family Code.

section 1101 provides for a *mandatory* award of attorney fees based on conduct that might be wholly innocent. (See *In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 43 [108 Cal.Rptr.2d 270]; *In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 993 [80 Cal.Rptr.2d 699].) Third, as a leading treatise observes, the statutorily imposed fiduciary duties in marital dissolution actions are extremely strict, making innocent violations easy to commit. (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2010) ¶ 8:618, p. 8-158.2 (rev. # 1, 2008).) A mandatory award of attorney fees, imposed regardless of the value of the asset at issue, is a harsh remedy for a violation that is merely technical and wholly innocent, as might often be the case, so it is unlikely the Legislature intended such a result.[2]

Because I conclude that Edward has forfeited the issue, in this case we need not decide whether, contrary to *In re Marriage of Hokanson* and *In re Marriage of Rossi*, subdivision (g) of section 1101 should be interpreted as providing for a discretionary rather than a mandatory award of attorney fees. But regardless of whether the statute as it stands is susceptible of such an interpretation, the Legislature might wish to consider amending the statute to make it unambiguously clear that the attorney fee award is discretionary, in conformity with the remainder of the Family Code and with what was likely the intent of the Legislature when it enacted the statute.

A petition for a rehearing was denied February 10, 2011, and on February 10, 2011, and February 24, 2011, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 27, 2011, S191025.

---

[2] I note, however, that before imposing a mandatory attorney fees award under subdivision (g) of section 1101, the trial court must "determine that the party has or is reasonably likely to have the ability to pay." (§ 270.)