Filed 6/30/22  Marriage of Corvese and Pytel CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re the Marriage of TAMARA AND ANTHONY PYTEL. | |
| TAMARA LUCILE CORVESE, | E074266 |
| Respondent, | (Super.Ct.No. IND1700154) |
| v. | OPINION |
| ANTHONY MICHAEL PYTEL, | |
| Appellant. | |

APPEAL from the Superior Court of Riverside County. Kristi Hester, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

La Quinta Law Group and Timothy L. Ewanyshyn for Appellant.

Westover Law Group and Andrew L. Westover for Respondent.

1

Anthony Pytel appeals from a judgment entered after his divorce trial. He argues the evidence doesn't support the finding that he freely and voluntarily transmuted, or changed the character of, the family residence from his separate property to community property. Specifically, he claims his ex-wife failed to rebut the presumption of undue influence that accompanies an interspousal transaction that disadvantages one spouse and advantages the other. We conclude the record sufficiently supports the characterization of the residence as community property and affirm.

## I

## FACTS

Tamara Corvese and Anthony Pytel were married for 19 years and raised two children together—a son and a daughter, who are now adults. During the marriage, Tamara took care of the children and managed the household while Anthony, the sole income-earner, managed all the financial decisions for the family.

Among the many issues the couple disputed during their divorce was the status of the family residence, which occupies two lots on Lingo Lane in Palm Desert (one lot contains the residence; the other a swimming pool). Tamara listed the residence as community property in her divorce petition; Anthony listed it as his separate property in his response.

The Lingo Lane residence has been in Anthony's family since the late 1960s, when his father purchased it after returning home from the Vietnam War. Tamara and Anthony were married in 1997. The following year, Anthony's parents helped the couple

2

purchase their first home by obtaining a veteran's loan. For the approximately five years the couple lived in their first home, they paid the mortgage payments on the loan, and Anthony owned the property with his parents as tenants in common.

On November 25, 2002, Anthony's parents transferred ownership of the Lingo Lane residence to their son. The deed granted title to Anthony, "a married man," as his "sole and separate" property. Two days later, on November 27, 2002, Anthony executed a notarized promissory note agreeing to pay his parents a total of $144,200 at a rate of $600 a month for 30 years, at an interest rate of 2.9%, "upon the sale or rental of" the couple's first home.

On February 11, 2003, Anthony's parents transferred their interest in the first home to Anthony, and the following month he sold the property for a net profit of approximately $80,000. On September 24, 2003, after the couple had been living in the Lingo Lane residence for several months, Anthony executed a grant deed conveying title in the property to himself and Tamara, "husband and wife as joint tenants." These are the undisputed facts about the property; the rest is hotly disputed.

According to Tamara, she and Anthony had purchased the Lingo Lane residence from his parents for $144,200, as evidenced by the promissory note. According to Anthony and his mother, Norma, Anthony's father gave him the Lingo Lane residence as a gift, with the intention that Anthony would then pass it on to his son, Steven. Both Anthony and Norma described their family's strongly held belief that the property remain on the male side so ownership would always bear the family surname. Although there

3

were women in the Pytel family (both Anthony and Steven have sisters), they would never receive an interest in the property for fear their married names would end up on the deed.

Anthony denied the promissory note had anything to do with the Lingo Lane residence. He said he had executed the note as a symbol of his appreciation to his parents for having secured the loan for his first home since he wouldn't have been able to obtain a loan on his own with his credit.

As to the deed granting Tamara joint ownership in the Lingo Lane residence, Tamara said Anthony wanted her to be protected if anything ever happened to him. She said once they had moved into the home, Anthony "made a point of telling me that he was going to change—you know, deed it—put my name on the deed after it was put in his." On cross-examination, she denied ever having pressured Anthony to put her on the deed, explaining that he "had said it was our home and that he'd make sure that I was safe in our home." She described the renovation and landscaping she had done when they moved in and said Anthony had told her "he was protecting [her]" because they had put their money and hard work into the home.

Anthony's mother remembered when her son gave Tamara co-ownership of the residence. She said Anthony told her that he'd done it so that, "if something were to happen to him," the house "would go over to Tamara." She said she told her son he "was crazy" for giving Tamara ownership rights because the house "was supposed to be for him [to] keep it under the Pytel name."

4

As for Anthony's account, he said he hadn't understood what the deed was actually doing. He said Tamara's aunt who worked as a legal secretary had drafted the deed and he'd felt pressure from Tamara's side of the family to sign it. His intent in executing it was to make sure that, in the event of his death, Tamara immediately passed the residence on to their son. He said he had no idea the deed was granting any ownership rights to his wife. He said he knew a lot about property values in his area and their residence would have been worth about $800,000 at that time.

At multiple points in his testimony, Anthony said he loved his wife very much. He said Tamara had "meant everything" to him and that, with the exception of the last few years, their marriage had been strong. He admitted she had never asked him to make her a co-owner, and he couldn't say why he hadn't made a will to pass the residence to his son on the event of his death.

After nine days of testimony, Riverside County Superior Court Commissioner Kristi Hester issued her ruling. Though she viewed the evidence on the issue as close, she found that Anthony had acquired the Lingo Lane residence as a gift, making it his separate property initially. She also found, though, that Anthony changed the character of the residence to community property early on in the marriage, by executing the 2003 deed that conveyed title to him and Tamara as joint tenants. "When not only Tamara testified that this was done by her husband to make sure that she was provided for after his death, *his own mother* testified to that. That honestly, for me, was a big factor in arriving at the decision that, in fact, a transmutation had taken place in the filing of the

5

grant deed. I believe Anthony, when he added his wife's name to the property, did so intending to provide for her in the event if anything were to happen to him." (Italics added.)

The commissioner rejected Anthony's argument that he didn't understand the legal consequences of the deed and was unduly influenced by Tamara and her relatives. "I do not believe that there was undue influence. . . . When I considered all of the testimony that was given during the course of the trial, testimony from witnesses on both sides including Anthony's mom was that he *wanted to make sure that Tamara was taken care of in the event that something happened to him*. He wanted to make sure that she would be okay, that she would have a place to live, and that, in fact, when I heard that testimony specifically from his mother, . . . I found that to be significant. [¶] And based on the fact that Anthony testified repeatedly about how much he loved his wife and he wanted to take care of her, I believe that when he added her to the property, he did so wanting to provide for her and also wanted to believe that she would . . . kind of continue with the wishes of his parents that ultimately the home would remain in the family. I do believe when he added her to the property, he did so thinking that she . . . would pass the property on to Steven because those were his wishes. [¶] But I do believe that when he added her to the property that he knew what he was doing, that it was not the result of undue influence, that he was doing it because he really thought that he was doing what was best for his family." (Italics added.)

6

## II

## ANALYSIS

Anthony argues the characterization of the Lingo Lane residence as community property is not supported by the record because Tamara failed to rebut the presumption that the transmutation was the product of undue influence. We disagree.

"In a marital dissolution proceeding, a court's characterization of the parties' property—as community property or separate property—determines the division of the property between the spouses." (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1399.) Property a spouse acquired before the marriage is that spouse's separate property. (Fam. Code, § 770, subd. (a)(1).) Property a spouse acquired during the marriage is community property unless it falls under an exception, like the one applicable here, for property acquired by gift. (*Id.*, §§ 760, 770, subd. (a)(2).)

The couple may, however, "transmute," or change the character of, property from community to separate or from separate to community through a transfer or an agreement. (Fam. Code, § 850.) And, because "spouses occupy a confidential and fiduciary relationship with each other" they owe one another "a duty of the highest good faith and fair dealing" in that or any other transaction. (*In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 343 (*Fossum*).) As a result, "if an interspousal transaction results in one spouse obtaining an advantage over the other, a rebuttable presumption of undue influence will attach to the transaction." (*Ibid.*; see also "*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 287.) When the presumption applies, the spouse who was

7

advantaged by the transaction must establish—by a preponderance of the evidence—that the disadvantaged spouse's action was "'freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of the effect of' the transaction." (*Fossum*, at p. 344.)

As an initial matter, we reject Anthony's claim that we must decide the characterization of the Lingo Lane residence de novo, without any deference to the commissioner's decision. This is because, contrary to his characterization, his appeal does not raise a "pure question of law." Rather, his claim that Tamara failed to overcome the presumption of undue influence is a factual question subject to the substantial evidence standard. (See, e.g., *Fossum*, *supra*, 192 Cal.App.4th at p. 344 ["'whether the spouse gaining an advantage has overcome the presumption of undue influence is a question for the trier of fact, whose decision will not be reversed on appeal if supported by substantial evidence'"].)

Under that standard, we review the record in the light most favorable to the commissioner's finding to determine whether it is supported by solid, credible evidence, which may even come in the form of testimony from a single witness, including a party. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) We may not reweigh the evidence—if the record is subject to differing inferences, we assume the commissioner resolved any conflicting inferences in favor of the judgment. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398.)

Applying these principles here, we conclude substantial evidence supports the commissioner's conclusion that Tamara rebutted the presumption of undue influence accompanying the 2003 reconveyance. The issue came down to a credibility contest between Tamara and Anthony. Tamara said Anthony gave her ownership rights in the home to protect her in the event of his death and in recognition of the fact it was their family's home and she had put a significant amount of work into it. Anthony denied these were the reasons, claiming instead he was pressured into executing a deed he didn't understand, and all he had wanted was to ensure his son would receive the residence when he died.

Had this been the only evidence before the commissioner, Tamara's testimony alone would have provided a sufficient basis for her to conclude there had been no undue influence, as she was free to believe Tamara over Anthony. But Tamara and Anthony were not the only witnesses who testified about the 2003 deed. Anthony's mother—who, by her own admission, wanted ownership to remain entirely with her son—said her son's decision was based on his desire to ensure his wife had a place to live if anything happened to him. Because it comes from a witness with a clear interest in the outcome of the trial, this testimony constitutes highly reliable evidence that Anthony acted with full knowledge and free will when he conveyed an interest in the property to Tamara.

Additionally, the record provides a reasonable basis for disbelieving Anthony's claim that he essentially mistook a deed conveying title to his wife for a will passing title

9

to his son. Anthony himself admitted Tamara had never asked him to make her a co-owner. And, of the two of them, he was the one with more knowledge of real estate transactions. He had been involved in the purchase and sale of their first home and had been the beneficiary of two previous deeds. Given his superior knowledge and experience with real estate, the commissioner could disbelieve his claim that Tamara had tricked him into giving her an interest in the property.

Anthony's reliance on *In re Marriage of Delaney* (2003) 111 Cal.App.4th 991 does not help him because the case is so factually distinct. There, the appellate court found substantial evidence of undue influence because the record demonstrated the disadvantaged spouse was cognitively impaired and "had entrusted all marital financial and legal matters" to the advantaged spouse—who happened to "specialize[] in probate work." (*Id.* at pp. 994, 1000.) Here, in contrast, it is the *disadvantaged* spouse (Anthony) who made all the financial decisions in the marriage and had more experience with real estate transactions. (See *People v. Rundle* (2008) 43 Cal.4th 76, 137-138 [in a substantial evidence review, comparison to cases with stronger facts yields "little value" because the analysis depends on "the unique facts and inferences present in each case"].)

For all of these reasons, we conclude the characterization of the Lingo Lane residence is supported by substantial evidence.

10

### III

### DISPOSITION

We affirm the judgment. Respondent shall recover her costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


SLOUGH _____
                              J.

We concur:


MILLER _____
             Acting P. J.


FIELDS _____
                   J.

11