Filed 5/9/16  Marriage of Stone CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the Marriage of BETTE W. STONE and WESTCOT B. STONE, III. | B243240 |
| BETTE W. STONE, | (Los Angeles County Super. Ct. No. BD492069) |
| Plaintiff and Appellant, | |
| v. | |
| WESTCOT B. STONE, III, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael J. Convey, Judge.  Reversed in part, affirmed as modified in part, and remanded.

Barbakow & Ribet, Claudia Ribet and Elizabeth Skorcz Anthony; Ribet & Silver and Claudia Ribet, for Plaintiff and Appellant.

Olsen & Olsen and Casey A. Olsen, for Defendant and Appellant.

_____

Westcot B. Stone and Bette W. Stone both appeal from the judgment in a marital dissolution action.[1] Westcot identifies numerous errors in the judgment and challenges the validity of the parties' prior settlement agreement (signed in 2008), on which the judgment in the dissolution action is partly based. Bette challenges only the damages and attorney fees awarded against her for breach of fiduciary duty under Family Code section 1101, subdivision (g).[2]

The judgment is modified to clarify that the parties are not required to pool their post-divorce Social Security benefits, pursuant to our previous decision (*Stone v. Stone* (Oct. 18, 2012, B239097 [nonpub. opn.] (*Stone I*)), and a limited accounting is ordered to be performed as to such benefits. We reverse Bette's reimbursement award due to its noncompliance with the parties' 2008 agreement and her need-based attorney fee award under section 2030 due to its failure to account for the parties' actual economic situation. We also reverse the remedies awarded to both parties for their respective breaches of fiduciary duty under section 1101, subdivision (g). We remand the case for a redetermination of these awards consistent with the views expressed in this decision and for an adjusted equalization payment. In all other respects, we affirm the judgment as modified.

## FACTUAL AND PROCEDURAL SUMMARY

The parties married in 1956. They were unhappy with each other from the start, discussed divorce as early as their honeymoon, and in the 1980's began living apart, albeit in the same residence. During the marriage, Westcot worked as a pilot; Bette was a homemaker.

Westcot added Bette's name to the title for the family home in Palos Verdes Estates (the Palos Verdes property), which he had bought before the marriage. The

---

[1] Because the parties have the same last name, we refer to them by their first names.

[2] All statutory references are to the Family Code.

2

parties acquired real property in the British West Indies, Coronado, and Hawaii (the latter two properties are owned through an entity called Elkiwe LLC). Westcot inherited real property located on Wilshire Boulevard (the Wilshire property), which was subject to a ground lease set to expire in 2032.

In the late 1980's, the parties transferred their properties to a family trust without changing their character. In 1995, however, they agreed to characterize all their assets as community property. In 2006, Westcot sued Bette for breach of fiduciary duty and fraud, and sought to rescind the 1995 agreement, alleging Bette had deceived him into signing it. In 2007, he sought to quiet title to the Wilshire property. The parties stipulated to a settlement of their disputes, and in March 2008 they, along with their two surviving children, executed a formal settlement agreement.

The 2008 agreement nullified the 1995 agreement, transferred ownership of Elkiwe LLC to the children, declared the Wilshire property Westcot's separate property, subject to certain limitations, and identified the Palos Verdes and the British West Indies properties as community property. While alive, Westcot and Bette were to deposit all their income into a joint checking account, from which Bette was to pay certain specified expenses related to the real properties and income taxes. Any remaining funds in the joint account were to be divided equally and deposited into the spouses' separate accounts every month. All other expenses were to be paid from the separate accounts. During their joint lifetimes, neither Westcot, nor Bette could sell, mortgage, dispose of or encumber the real properties without the prior written consent of the other spouse and the children. If the marriage were dissolved, all properties owned by Westcot and Bette, other than the Wilshire property, were to be deemed community property, and the spouses were not to seek relief inconsistent with the settlement agreement. The spouses also agreed to change the title to the properties they owned to conform with the agreement and to prepare estate planning documents to give their respective interest in both separate and community property to the surviving spouse in a qualified terminable interest property (QTIP) trust. The provisions of the agreement were to continue in

3

effect so long as either spouse was alive, and the final property distribution to the children was to occur upon the survivor's death.

In April 2008, Westcot's breach of fiduciary duty and fraud action against Bette was dismissed pursuant to a stipulated judgment, which referenced the 2008 agreement. The quiet title action already had been dismissed.

In September 2008, Bette petitioned to dissolve the marriage. A partial judgment terminating the parties' marital status was entered in December 2009. In June 2011, the family court issued a final statement of decision on property division after trial. The court found the 2008 agreement had merged into the 2008 judgment, was valid and binding in the dissolution action, and controlled the division of property. The court found that, under the 2008 agreement, the Wilshire property was Westcot's separate property, but all income from it was community property and joint income so long as the spouses lived, and the expenses as to that property were joint expenses. The court treated the Palos Verdes and British West Indies properties as community property to be paid for from the joint account under the 2008 agreement, but since Westcot had exclusive use of the Palos Verdes property, he was required to pay Bette rent. The court found that Bette was entitled to reimbursement under the 2008 agreement and that each spouse had breached his or her respective fiduciary duties to the other. A partial judgment was entered in September 2011, but was later vacated.

In November 2011, Westcot filed a motion to set aside the 2008 judgment in the civil court. The motion was denied, and in the ensuing appeal, *Stone I*, *supra*, B239097, we affirmed in part and reversed in part. We ordered two unlawful provisions severed from the 2008 agreement. One required the spouses to pool their post-divorce Social Security benefits; the other allowed them to withhold their consent unreasonably in transactions affecting their real properties. (*Id*. at pp. 2, 36.)

Meanwhile, in February 2012, the family court issued a final decision on the bifurcated issues of attorney fees and costs, awarding each party damages and attorney fees under section 1101, subdivision (g), and awarding Bette need-based attorney fees

4

under section 2030. The final judgment in the dissolution action was filed in June 2012. Westcot appealed, and Bette cross-appealed.

## DISCUSSION

### I

This case presents in a somewhat unusual procedural posture because the 2008 agreement was separately declared valid by two different departments of the superior court, and we already affirmed its general validity in the appeal from the civil court's order in *Stone I*, *supra*, B239097. The adjudication of the family court, which came first, was made at the property division stage, but no appeal was taken from that adjudication until the final judgment in the dissolution action. In the previous appeal, we declined to consider the family court's conclusions because they were not before us at the time. (*Id.* at p. 7, fn. 5.) Westcot challenges those conclusions now, and Bette argues that at least some of his challenges are barred by the law of the case doctrine because they are covered by our decision in *Stone I*. That doctrine applies to issues that were "implicitly decided because they were essential to the decision on the prior appeal," but not to points of law "which might have been but were not presented and determined" in it. (*Estate of Horman* (1971) 5 Cal.3d 62, 73.) Since we declined to consider the family court's conclusions before, we will consider them now.[3]

---

[3] Nevertheless, we note that pursuing the same relief in different departments of the superior court generally is discouraged. Where a case is being adjudicated in one department, it is beyond the jurisdiction of another department to interfere because of the danger of conflicting adjudications, and the latter proceeding may be subject to a plea in abatement. (See generally 2 Witkin, Cal. Procedure (5th ed. 2008) Courts, § 229, p. 313; see also *Allstate Ins. Co. v. Mel Rapton, Inc.* (2000) 77 Cal.App.4th 901, 910.) Westcot argued in the family court that enforcing the 2008 agreement in the dissolution action was in excess of the court's jurisdiction. But he does not raise the issue on appeal, and in any event, there was no proceeding pending in the civil court at the time the family court considered the enforceability of the agreement. On the other hand, Bette apparently did not object to Westcot's piecemeal challenge of the 2008 agreement in two different departments, thus waiving any impropriety. (See *ibid.* [plea of abatement may be

In this appeal, Westcot argues the 2008 agreement is void because Bette fraudulently induced him to sign it by not disclosing that she had consulted a divorce attorney during the negotiations and because she falsely promised to give him title to the Wilshire property.  He also argues the agreement fails for lack of mutual assent as to the character of the Wilshire property, and that it is void as against public policy because it promotes divorce.  Alternatively, he contends that paragraph E of the agreement is an invalid transmutation of the income from the Wilshire property into community property.

We review issues of law de novo and factual findings for substantial evidence.  (*Apex LLC v. Sharing World, Inc.* (2012) 206 Cal.App.4th 999, 1009.)  The "interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence.  [Citation.]"  (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.)  Where the extrinsic evidence is in conflict, "'the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence.  [Citation.]'"  (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 713.)

A.  *Failure to Disclose Intent to Divorce / Contract Promotive of Divorce*

Billing statements of attorney Michael Vollmer, who represented Bette during the negotiation of the 2008 agreement, show that in the days before its execution Vollmer talked on the phone with, and provided information to, Chris Moore, the attorney who eventually represented Bette in the dissolution action.  The family court did not allow Westcot to cross-examine Bette on the subject of the consultation and declined to draw an adverse inference against Bette because the 2008 agreement itself contemplates that the spouses might divorce.  Westcot argues he would not have signed the agreement had he known that Bette had consulted with a family law attorney.

An action for fraud based on concealment requires showing that the defendant intentionally concealed or suppressed a material fact, as to which there was a duty to

waived]; *In re Marriage of Hinman* (1992) 6 Cal.App.4th 711, 716–717 [acts in excess of jurisdiction are subject to consent and waiver].)

disclose. The plaintiff must have been unaware of the fact and must have been harmed as a result of acting in ignorance. (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612–613.) There is a duty to disclose material facts when the parties are in a fiduciary relationship or when one party has exclusive knowledge of the facts. (*Los Angeles Memorial Coliseum Commission v. Insomniac, Inc.* (2015) 233 Cal.App.4th 803, 831.) Material facts are facts that might affect a party's willingness to enter into or complete a transaction. "The test of materiality is objective: whether a reasonable person in the plaintiff's position would have acted differently had he known the undisclosed facts. [Citation.]" (*Roberts v. Lomanto* (2003) 112 Cal.App.4th 1553, 1567.)

Westcot claims he would not have knowingly agreed to deposit his income from separate property into a joint account under the control of "a woman who intensely dislikes him." But the record shows Westcot was well aware Bette disliked him. They had led separate lives for years and had discussed divorce on many occasions. Westcot had complained to police about Bette. The 2008 agreement was the result of civil lawsuits he had filed against Bette during the marriage. According to Westcot's own testimony, the spouses' relationship continued to be contentious during the negotiations of that agreement. Even if he did not know about the particular attorney consultation, Westcot was aware of sufficient facts relevant to the state of the marriage to know it might not last.

Under the objective test for materiality, Westcot's claim that he would not have signed the agreement had he known Bette consulted with a family law attorney is unreasonable. The attorney-negotiated 2008 agreement itself envisions the possibility of separation and divorce, but provides that neither would affect the spouses' real property and joint income rights under the agreement. In light of those provisions, each spouse had an interest and a right to consult with a specialized family law attorney, whether directly or through the attorney who negotiated the settlement agreement in the civil case on his or her behalf. (See e.g. Rules Prof. Conduct, rule 3-110(c) [professional duty of competent representation may be fulfilled through consultation with competent attorney

in specialized area].) Bette's consultation with a family law attorney was, therefore, not unexpected under the circumstances, and the subject of the consultation is protected by attorney-client privilege. That Westcot did not consider the practical effect of the provisions to which he agreed does not entitle him to set aside the agreement for fraud. (See *Kahn v. Lischner* (1954) 128 Cal.App.2d 480, 490 ["a transaction will not be deemed fraudulent because the party complaining made a bad bargain [citation] . . ."].)

Westcot's argument that the 2008 agreement violates public policy because it promotes divorce also lacks merit. "Neither the reordering of property rights to fit the needs and desires of the couple, nor realistic planning that takes account of the possibility of dissolution, offends the public policy favoring and protecting marriage. It is only when the terms of an agreement go further—when they promote and encourage dissolution, and thereby threaten to induce the destruction of a marriage that might otherwise endure—that such terms offend public policy." (*In re Marriage of Dawley* (1976) 17 Cal.3d 342, 358.) A contract typically promotes divorce if it benefits a spouse only in the event of divorce. For instance, a husband's promise to give his wife real property and a substantial sum of money upon divorce violates public policy because by its terms it encourages the wife to promptly seek dissolution of the marriage. (*In re Marriage of Noghrey* (1985) 169 Cal.App.3d 326, 331; see also *In re Marriage of Dajani* (1988) 204 Cal.App.3d 1387 [Jordanian dowry contract was unenforceable because dowry was payable upon marriage dissolution or husband's death].)

The 2008 agreement does not promote divorce. By its terms, it settles the spouses' rights to real property and income of any kind regardless of whether they remain married or divorce. While the agreement gives Bette rights to share in the income from the Wilshire property and have a say in its transfer, neither right is contingent on her divorcing Westcot. That she chose to file for divorce soon after signing the agreement is irrelevant under the circumstances since she could have enforced those rights in civil court while remaining married.

8

*B. Lack of Mutual Assent / Promissory Fraud*

The 2008 agreement required Bette to place title to the Wilshire property in Westcot's name within 30 days. In deposition testimony and at trial, she variously testified she had fully complied with the terms of the agreement and wanted to enforce it against Westcot who had not; yet, she also considered the Wilshire property to be community property, which was contrary to the terms of the agreement, and she did not recall being asked to sign, or signing, a deed transferring the property to Westcot. Relying on Bette's testimony that she considered the Wilshire property to be community property, Westcot seeks to rescind the 2008 agreement on the grounds that she never agreed the property was his alone and that her promise to treat it as such was fraudulent.[4]

Westcot acknowledges that the relevant inquiry is about Bette's belief at the time the 2008 agreement was executed. But the issue of mutual assent does not turn on the parties' subjective beliefs; it "'is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings. [Citation.]' [Citations.]" (*Deleon v. Verizon Wireless, LLC* (2012) 207 Cal.App.4th 800, 813.) Westcot's reliance on Bette's subjective understanding of the terms of the agreement, expressed years later, is misplaced since she objectively agreed to its terms when she signed it. (See *Meyer v. Benko* (1976) 55 Cal.App.3d 937, 943–944 [one who signs an agreement is deemed to have consented to its terms regardless of any claimed lack of knowledge or understanding].)

Promissory fraud requires proof of intent not to perform a promise, but such proof must consist of more than "an unkept promise or mere failure of performance."

---

[4] The parties disagree whether the 2008 agreement has merged into the 2008 judgment and therefore is not independently enforceable. Westcot in particular complains that Bette has repeatedly changed her position on this issue. As in the previous appeal, we find it unnecessary to address the issue. (See *Stone I*, *supra*, B239097, at p. 12, fn. 7.) Although the family court concluded the agreement was merged into the 2008 judgment, it also ruled the agreement itself was valid and enforceable.

9

(*Riverisland Cold Storage, Inc. v. Fresno–Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183.) Westcot relies on select portions of Bette's litigation testimony and her unwillingness to transfer the deed to the Wilshire property during the pendency of the dissolution action. According to Bette, she did not do so because she was afraid that Westcot would compromise her rights under the 2008 agreement. Bette's testimony was internally inconsistent. She testified she intended to comply with the terms of the agreement, but she was confused about what those terms were and admitted she would have to rely on the advice of counsel. The family court resolved the contradiction in her testimony by finding that Bette's principal objective at trial was to enforce the 2008 agreement, but "when questions were posed to her that caused her to form thoughts independent of her objective . . . , she did not appear credible or reliable." The court concluded that Bette's misinterpretation of the terms of the agreement did not control since her counsel had conceded that the Wilshire property was not community property. Thus, the court chose to give weight to that portion of Bette's testimony that was consistent with the terms of the 2008 agreement and to disregard her inconsistent testimony as unreliable, not credible, and legally irrelevant. The court found that Bette refused to transfer over the deed to the Wilshire property because she was unsure Westcot would keep his end of the bargain, as he, too, had breached the 2008 agreement.

On appeal, we resolve all conflicts in the evidence and draw all reasonable inferences in favor of the judgment; we do not reweigh the evidence or redetermine the credibility of witnesses. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) Hence, we decline Westcot's invitation to treat Bette's confusion about the terms of the 2008 agreement during the divorce proceeding as proof that she never intended to comply with those terms.

### C. Transmutation

Westcot argues that paragraph E.1 of the 2008 agreement fails to create a valid transmutation of the income from the Wilshire property from his separate property to community property.

10

As a general rule, "income produced by an asset takes on the character of the asset from which it flows. Thus, rents, issues and profits are community property if derived from community assets, and separate property if derived from separate assets. [Citations.]" (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 851.) However, the spouses may agree to transmute, i.e. change, the character of any of their property. (§ 850.) "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (§ 852, subd. (a).)

Whether a writing contains an express declaration is reviewed de novo. (*In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 588.) The writing must clearly state that "a change in the characterization or ownership of the property is being made," but is not required to use a particular term, such as "'transmutation,' 'community property,' or 'separate property.'" (*Id*. at pp. 588, 589, citing *Estate of MacDonald* (1990) 51 Cal.3d 262, 273.) In *Estate of MacDonald*, the wife's signature consenting to the designation of her husband's trust as a beneficiary of IRA accounts into which community pension funds were deposited was held insufficient to effect a transmutation of those funds into the husband's separate property. (*Id*. at pp. 265, 272.) The court explained that the document the wife signed would have been sufficient had it included an additional sentence stating, "'I give to the account holder any interest I have in the funds deposited in this account.'" (*Id*. at p. 273.)

We interpret contracts as a whole and in context, rather than construing their provisions in isolation. (See *Thompson v. Toll Dublin, LLC* (2008) 165 Cal.App.4th 1360, 1370.) Bette's argument that paragraph E.1 does not transmute the character of income from separate property deposited into the joint account is not convincing because it does not address the express provision in this paragraph that income be deposited into the account as "community property." But in arguing that the paragraph invalidly transmutes separate into community property, Westcot turns the 2008 agreement on its head. The Wilshire property was transmuted into community property in the 1995 agreement, and that agreement was still in force when the parties entered into the 2008

11

agreement. The 2008 agreement transmutes the Wilshire property back into Westcot's separate property with the express limitation that income from that property must be deposited in the joint account as community property.

The 2008 agreement accomplishes that by declaring, in paragraph C.1, that the Wilshire property is Westcot's separate property, subject to other provisions. Paragraph E.1 then states that "[a]ll income and other gross receipts of any kind . . . shall be deposited into [a joint account] as community property." It is clear that the income from the Wilshire property is to be deposited into the joint account because paragraph C.1 provides: "Neither the deposit of the income from the Wilshire Property in the Account, nor the use of the income to pay community obligations shall affect the character of the Wilshire Property as Westcot's sole and separate property." Paragraph C.1 does not declare the income from the Wilshire property to be separate property. Instead, the paragraph makes it clear that the real property is characterized differently from income derived from that property. Read together, paragraphs C.1 and E.1 expressly require that the income from the Wilshire property be deposited into the joint account as community property, even though the real property itself is Westcot's separate property.

Westcot's citation to *In re Marriage of Valli* (2014) 58 Cal.4th 1396 and *In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411 is unavailing since neither the life insurance policy in *Valli*, nor the house downpayment in *Bonvino* was intended to identify the character of property. In contrast, here, the express purpose of paragraphs C.1 and E.1 is to characterize the Wilshire property as separate property and all income deposited in the joint account, including income from the Wilshire property, as community property.

We see no reason to invalidate the 2008 agreement in whole or in part, and proceed to address Westcot's alternative challenges to the final judgment.

II

"The meaning and effect of a judgment is determined according to the rules governing the interpretation of writings generally. [Citations.] '"[T]he entire document is to be taken by its four corners and construed as a whole to effectuate the obvious

12

intention.'" [Citations.] "'No particular part or clause in the judgment is to be seized upon and given the power to destroy the remainder if such effect can be avoided.'" [Citations.] [¶] Where an ambiguity exists, the court may examine the entire record to determine the judgment's scope and effect. [Citations.] The court may also "'refer to the circumstances surrounding the making of the order or judgment, [and] to the condition of the cause in which it was entered.'" [Citations.]" (*People v. Landon White Bail Bonds* (1991) 234 Cal.App.3d 66, 76.)

### A. Cotenancy Issues

Westcot argues that because the family court did not divide the parties' interest in community real property and the joint account, it was required to specify whether they had agreed to hold these assets as joint tenants or tenants in common after the divorce. In *Stone I, supra*, B239097, we explained that post-divorce the parties were "obliged to hold the funds [in the joint account] in a manner closely reflecting the funds' pre-divorce status as community property, that is [they] must take appropriate action to hold the funds as joint tenants or tenants in common." (*Id.* at p. 23.) On the record before us, we observed that the family court had reached the same conclusion. (*Id.* at p. 23, fn. 11.)

Westcot insists that the family court should have determined whether the parties agreed to hold the former community property assets as joint tenants or tenants in common with respect to their creditors. The court did make such a determination when, in response to Westcot's objections, it found no express intent to hold the community real property as joint tenants. The default rule is that interests in community property undivided in a divorce decree are held by the former spouses as tenants in common. (*In re Marriage of Georgiou and Leslie* (2013) 218 Cal.App.4th 561, 575.) Because the family court did not divide the parties' interests in community property covered by the 2008 agreement, by default they continue to co-own undivided interests in that property as tenants in common. However, under paragraph D.1 of the 2008 agreement, each spouse is required to prepare estate planning documents leaving all his or her property to the surviving spouse. The family court declined to limit the parties' future options were

13

they to agree in the future on a particular form of ownership, or on the sale and division of their property.

The use of the joint account is limited by the 2008 agreement to the payment of specified expenses relating to taxes and the ownership and maintenance of the couple's real property portfolio, with any remaining funds to be divided equally into their separate accounts at the end of each month. The judgment provides that if the ground lease for the Wilshire property is renegotiated for a lump sum, the net proceeds after payment of taxes should be used to pay off community debts and equalize payments "from the respective party's half of the proceeds first," and then pay off attorney fees and costs. Westcot argues that this provision improperly requires the parties to share in his income from the Wilshire property before it is deposited into the joint account. We do not agree. The statement of decision provides that any lump sum from the renegotiation of the lease must be deposited into the joint account for the parties to share under the terms of the 2008 agreement. The judgment similarly provides that all income must be deposited into the joint account, from which specified expenses must be paid first. The provision to which Westcot objects should be read consistently with the statement of decision and the rest of the judgment, as providing that only after the remaining funds from any lump sum payment deposited into the joint account are divided into the parties' separate accounts will any expenses unspecified in the 2008 agreement be paid from the proceeds deposited in each party's account.

The judgment awards Westcot exclusive possession of the former family residence in Palos Verdes during his lifetime and requires him, "[i]n addition to payment of all expenditures" for the property under the procedure set forth in paragraph E.2 of the 2008 agreement, to pay Bette one-half of the fair rental value of the residence, effective March 1, 2009.[5] The parties read this provision as requiring that Westcot alone pay for the maintenance of the Palos Verdes property. That is not a fair reading because the challenged provision expressly refers to paragraph E.2 of the 2008 agreement. That

_____

[5] The date in the judgment appears to be incorrect. Westcot obtained exclusive possession on April 1, 2009, pursuant to a court order.

14

paragraph requires that expenses relating to the ownership and maintenance of jointly owned real property, including the Palos Verdes property, be paid from the joint account.

Westcot also complains that he is required to continue to pay rent to Bette even though the Palos Verdes property is no longer community property subject to credits under *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 (*Watts*). *Watts* credits are meant to compensate the community for the reasonable value of one spouse's "'exclusive use of a community asset during the period between separation and trial . . .' [Citation.]" (*In re Marriage of Falcone and Fyke* (2012) 203 Cal.App.4th 964, 978.) Since the parties continue to own undivided interests in the Palos Verdes property as tenants in common, they are subject to cotenancy, rather than community property, rules. A cotenant out of possession may be entitled to the imputed rental value as an offset to a claim for contribution for the maintenance and preservation of the property if doing so would be "just and consonant with equitable principles." (*Hunter v. Schultz* (1966) 240 Cal.App.2d 24, 32.) Here, the parties agreed to share all their income and to use that joint income to pay for the maintenance of the Palos Verdes property. We have been cited to nothing in the record showing Westcot argued that it would be unfair to require him to continue to pay Bette half of the fair rental value of the property post-trial despite their continued joint maintenance obligation. Our review shows his only objection was to the court's failure to divide the real property. He has, therefore, failed to show error. (See *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 31 [theories not fully developed or factually presented to trial court cannot create issue on appeal].)

Westcot argues the judgment must be amended to require Bette to deposit the rent she receives from him into the joint account. No such amendment is necessary since Bette does not dispute the judgment requires her to deposit income of any kind into that account.

Westcot also argues the judgment should be amended pursuant to our decision in *Stone I*, *supra*, B239097 at page 36 to clarify that he is not required to deposit his Social Security benefits into the joint account. Bette agrees. Westcot contends that since Bette

15

has not separately asked us to apply *Stone I* to her own Social Security benefits, she has forfeited that issue. In *Stone I*, we concluded that the provision that the spouses pool their post-divorce Social Security benefits was unlawful, and we ordered it severed from the 2008 agreement and stipulated judgment, over Bette's opposition. (*Id.* at pp. 28–32.) Our decision in *Stone I* is law of the case as to both parties in this appeal. (See *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491.) The judgment should be amended pursuant to *Stone I* to clarify that neither Westcot nor Bette is required to deposit post-divorce Social Security benefits into the joint account.

### B. The Consent Provision

The judgment prohibits Westcot from renegotiating the lease of the Wilshire property without the written consent of Bette and the couple's two children, provided that their consent may not be unreasonably withheld. Westcot argues the family court misconstrued paragraph F.1 of the 2008 agreement, on which this prohibition is based.

The preliminary 2007 agreement provided that during the spouses' joint lifetimes, "neither (without permission of the other) shall assign, sell, mortgage, [lien] or in any manner affect title to real property." Paragraph F.1 of the 2008 agreement similarly states: "During the joint lifetimes of Westcot and Bette, neither of them shall sell, mortgage, dispose of or in any way encumber (collectively, 'Transfer') any part of the Property Portfolio . . . without the prior written consent of all parties." The Wilshire property is part of the property portfolio.

According to Westcot, a lease is not an encumbrance, nor does it affect property title. But while a leasehold is not an ownership interest in land (*Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 163), it still may encumber or affect title since an encumbrance is broadly defined as "any property right that is not an ownership interest." (See Black's Law Dictionary (9th ed. 2009) p. 607.) A lease ordinarily is considered an encumbrance unless specifically excluded by agreement. (*Hawkins v. York* (1969) 2 Cal.App.3d 98, 106.)

Westcot's reliance on his daughter's trial testimony about her understanding of the word "encumbrance" and on his own belief that he was free to renegotiate the lease on

16

the Wilshire property is misplaced. "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.' [Citation.] The parties' undisclosed intent or understanding is irrelevant to contract interpretation. [Citations.]" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.) Had the parties intended to limit the scope of the term "encumbrance" to exclude the lease, they could have expressly done so, but we cannot imply such an exclusion into the language of the 2008 agreement. (See *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 764 [courts cannot insert omitted terms into contract].)

For the first time on appeal, Westcot argues that paragraph F.1 of the 2008 agreement, which requires the consent of all parties of the agreement to the encumbrance of any property in the property portfolio, violates public policy because it prevents the parties from encumbering their respective interests in community real property to pay their attorneys under section 2033, subdivision (a). Even were we to consider this belated argument, the consent provision in paragraph F.1 does not conflict with section 2033 because the statute does not authorize an automatic attorney lien; rather, it requires prior notice before recordation and allows the nonencumbering spouse to object to the lien. (§ 2033, subds. (b) & (c).) Moreover, as Westcot recognizes, section 2032, subdivision (c) gives the family court power "to order payment of an award of attorney's fees and costs from any type of property. . . ." The consent provision in the 2008 agreement does not prevent such an order.

*C. Accounting Issues*

Spouses may agree to divide their community and separate property in any manner they wish, and the court must follow their agreement, without scrutinizing whether property is divided equally. (§§ 2550, 2650; *Mejia v. Reed* (2003) 31 Cal.4th 657, 666; *Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1349.)

In paragraph E of the 2008 agreement, the parties agreed to pool their income in a joint bank account, from which payments could be made only for a limited number of

17

"[s]pecified [p]urposes." All other expenses, "including but not limited to clothing, grooming, recreation, boating, and other personal expenses," are to be paid from the parties' separate accounts, into which any leftover funds from the joint account are to be deposited in equal shares every month. Bette has primary responsibility to write checks from the joint account, but if she fails to do so, Westcot could write a check for any specified purpose. If one party withdraws funds from the joint account for any purpose other than those specified, he or she is required to reimburse the account, and the other party may request that the court deprive him or her of check writing privileges.

The parties agreed to account for past and future income and expenses. Specifically, they agreed to prepare an accounting from August 1, 2006 through January 31, 2008 for all cash in their possession, all receipts and all disbursements, by identifying the expenses by payee, date, amount, and purpose. If disbursements were made for other than specified purposes, the disbursing party was to reimburse the other party for one-half of such disbursements, as well as one-half of receipts received and not reflected in the accounting. The same accounting principles were to apply after February 1, 2008.

Bette's counsel conceded that her initial accounting was incomplete, and in April 2009, the parties' attorneys agreed that each side would prepare its own accounting. Patricia Harik had been appointed in February 2009 as a joint bookkeeper to manage the parties' joint account. At trial, Westcot offered an accounting Harik had prepared on his behalf, which summarized his income and expenses and included a general ledger, but did not provide for any reimbursement. Westcot's other accounting, by Ron Anfuso, disregarded the 2008 agreement, treating Westcot's income as his separate property, and concluding that Westcot was entitled to reimbursement for community expenses paid from his separate income after the date of separation (August 29, 2008). Bette's accountant, Elizabeth Acosta, claimed to have followed the 2008 agreement. However, she admittedly created a category of disbursement for unspecified community expenses even though it did not fall within the definition of specified purposes under paragraph E.2 of the agreement. Acosta concluded that Bette was entitled to $111,491 in

18

reimbursement of one-half of disbursements she had made both for specified purposes and for unspecified community expenses.

The court found Harik's "accounting sound, her calculations accurate," and gave "favorable weight" to her testimony. The court found Acosta's presentation difficult to follow, but accepted her report as "the more persuasive evidence of how reimbursements should be determined" under the 2008 agreement. The court did not accept Anfuso's reimbursement calculation because it disregarded the 2008 agreement. The court awarded Bette $111,491 in reimbursement based on Acosta's analysis.[6]

Westcot objected to the court's acceptance of Acosta's reimbursement analysis because the only reimbursements envisioned in paragraph E.8 of the 2008 agreement are for unspecified expenses and unreported receipts; moreover, it is the spouse who made the disbursements for unspecified purposes who must reimburse the other spouse for one-half of those disbursements, not vice versa. He repeats that objection on appeal.

We agree with Westcot that Acosta's reimbursement analysis does not comply with the terms of the 2008 agreement. The parties essentially agreed that going back to August 2006, they would limit their allowed expenses to those made for a few specified purposes and would reimburse each other for one-half of payments made for unspecified purposes, regardless of the type of expense. Going forward, they envisioned that all their income would be placed into a joint account from which payments would be made only for specified purposes and the remaining funds would be split equally; any non-conforming payments from the joint account were to be reimbursed to that account.

In reimbursing Bette for one-half of payments she made for unspecified community expenses, Acosta turned the 2008 agreement on its head. Under the agreement, it is Westcot who is entitled to reimbursement for one-half of any of Bette's disbursements for an unspecified purpose from any source in the period preceding the

---

[6] The reimbursement was later reduced by $30,000 because of an advance Bette had received on her share of the community property.

19

agreement, and for any withdrawal from the joint account for an unspecified purpose after that. Whether Bette is entitled to a reimbursement would require examination of Westcot's accounting to determine the amount of his disbursements for unspecified purposes under the same principles. The 2008 agreement does not envision that either spouse would be entitled to reimbursement for disbursements made for specified purposes.[7]

Bette argues that we should defer to the family court's findings on the reimbursement issue. However, whether the 2008 agreement allows the reimbursement awarded under Acosta's analysis requires interpretation of that agreement, and where the evidence is not in dispute, the interpretation of the agreement is an issue of law. (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.) The family court's endorsement of Acosta's analysis was incorrect as a matter of law because it was based on a misapplication of the reimbursement provisions in the 2008 agreement. We, therefore, reverse the award of $111,491 to Bette.

Westcot argues that we should remand for a new accounting, and he raises a number of claims for credit and reimbursement that should be included in that accounting. We conclude he has either forfeited or not shown entitlement to most of these claims.

Westcot contends that, under general family law principles, he is entitled to reimbursement for his use of separate funds to pay for the maintenance of the parties' boat and for a new motor for the parties' car. (See § 2640 [allowing reimbursement for acquisition and improvement of property in community estate traced to separate funds].) He also argues he is entitled to credits under *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84–85 for using separate funds to pay preexisting community debts after separation. In essence, he asks that we adopt his trial position that the 2008 agreement does not

---

[7] Another problem with Acosta's analysis is that she considered only half of the distributions Bette received from the joint account during Harik's management of that account in 2009, resulting in what appears to be a substantial unjustified reimbursement to Bette for that year.

20

control the characterization of funds or their use and does not prevent the parties from seeking relief under general family law principles.

As we have explained, paragraph E.2 of the 2008 agreement expressly limits the expenses allowed to be paid from the joint account, and provides that all other expenses must be paid from the parties' separate accounts. Paragraph E.8 requires the parties to reimburse each other retroactively for any disbursement made for a purpose not specified in the agreement as far back as 2006. Paragraph G.3 precludes either spouse from seeking any relief in a separation or dissolution proceeding that would be inconsistent with the provisions of the agreement. Read together, these paragraphs make clear that the parties have restricted their rights in the event of separation and divorce to those provided in the 2008 agreement.

The court correctly rejected Westcot's claims for reimbursement under general family law as inconsistent with the 2008 agreement since the agreement, rather than family law principles, controls the characterization of the parties' income and its use. The agreement precludes Westcot from claiming that he used separate funds to pay for community obligations under family law since the parties agreed to treat all their income as community property and to limit the expenses that could be covered from that income, in effect treating all other expenses as their separate expenses.

Belatedly, Westcot claims *Watts* credits for the period between August 2008 and March 2009 when, according to him, Bette had exclusive possession of the family home in Palos Verdes. His record references show only that he asked the court to give him exclusive possession of the home and to give Bette $30,000 in moving expenses; he cites nothing in the record showing that he asked the court to make a factual finding that Bette had exclusive possession of the family home at any time and to award him *Watts* credits. His claim for such credits, therefore, is forfeited. (See e.g. *Araiza v. Younkin* (2010) 188 Cal.App.4th 1120, 1127 ["A party who fails to alert the trial court to an issue that has been left unresolved forfeits the right to raise that issue on appeal," particularly where issue rests on disputed facts]; *Grinzi v. San Diego Hospice Corp.* (2004) 120 Cal.App.4th

21

72, 85 [allowing new theory on appeal would be unfair to trial court and opposing litigant].)

Westcot seeks a corrected accounting that would take into consideration Bette's failure to deposit the rent she receives from Westcot for his use of the Palos Verdes property into the joint account. Westcot's record citations show a change in the method of paying rent to Bette. She initially was paid rent from both parties' share in the joint account; later she was paid from Westcot's share alone. However, Westcot has not shown that he raised the issue that the rent he paid Bette should be treated as income to her and deposited into the joint account at any time before judgment was entered. His claim for reimbursement is, therefore, forfeited.

We reverse the reimbursement award to Bette and reject Westcot's claims to credits and reimbursements that are either inconsistent with the 2008 agreement or that were not presented to the family court. As we explained, under *Stone I*, *supra*, B239097, the post-divorce pooling of Social Security benefits is unlawful, and both parties are entitled to an accounting for such pooled benefits. We remand the case for such limited accounting, and for a redetermination of their respective rights to reimbursement under the terms of the 2008 agreement. If practically possible, the parties and the court should consider using the parties' completed accountings to determine their total income and respective disbursements for unspecified purposes in the period preceding the agreement, each spouse being entitled to one-half of the other spouse's disbursements for unspecified purposes. In the period following the 2008 agreement, each party may be entitled to reimbursement for half of any unauthorized disbursement the other made from, and did not restore to, the joint account.[8] As we explain later, Bette also may be entitled to reimbursement for half of any income Westcot failed to deposit in the joint account.

---

[8] Westcot made a similar proposal in his objection to the accounting portion of the tentative statement of decision, where he represented that the parties' income and unspecified expenses can generally be determined from their accountings. (See Appellant's Appendix, Vol. VIII: 1995-1997.)

22

Westcot may be entitled to equalize the parties' expenses on the Palos Verdes property paid from the joint account since the characterization of some of those expenses apparently changed depending on who lived there. Harik testified she determined that utilities were not a specified purpose under the 2008 agreement, and she reimbursed Bette for utilities paid from the joint account while Westcot resided on the property. On the other hand, Acosta treated all of Bette's expenses incident to her living on the property as payments for specified purposes. On remand, the parties' expenses on the Palos Verdes property must be consistently treated as made for specified purposes if they pertain directly to the ownership and maintenance of the property, or as personal expenses if they are incident to one party's living on the property. For instance, payments for gardening and repairs may be treated as made for specified purposes, but payments for utilities and housekeeping should be consistently treated as personal expenses.

Absent evidence that she allowed one party to charge unauthorized expenses to the account and did not reimburse the account or the other party for such expenses, we see no reason to reimburse either party for unspecified expenses paid from the joint account after Harik was appointed to manage that account for the benefit of both parties. Under the terms of the 2008 agreement, we also see no basis for reimbursement for expenses paid from funds properly distributed from the joint account to the parties' separate accounts.

### III

We next review the parties' challenges to the family court's award of attorney fees, costs, and sanctions.

#### A. *Need-based Attorney Fees*

Westcot challenges the award of $137,783.20 in attorney fees to Bette under sections 2030 and 2032. Section 2030 authorizes the family court to make a "'need-based'" attorney fee award in a dissolution action. (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 827.) The court may award attorney fees and costs under section 2030 "where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) "The fact

23

that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).)

The court has "considerable latitude in fashioning or denying an attorney fees award," as long as its decision reflects "an exercise of discretion and a consideration of the appropriate factors as set forth in code sections 2030 and 2032. [Citations.] In assessing one party's relative need and the other party's ability to pay, the family court may consider all evidence concerning the parties' current incomes, assets, and abilities, including investment and income-producing properties. Further, in determining whether to award attorney fees to one party, the family court may consider the other party's trial tactics. [Citation.]" (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1313–1314.) However, "the purpose of section 2030 is *not* the redistribution of money from the greater income party to the lesser income party. Its purpose is *parity*: a fair hearing with two sides equally represented." (*Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 251.) Nor is an award under that section meant to be in the nature of a sanction solely for preventing settlement and increasing the cost of litigation; that kind of sanction is separately authorized under section 271.

As directed in section 2032, subdivision (b), the family court considered the relevant factors listed in section 4320, such as the parties' earning capacity; ability to pay; needs based on marital standard of living; assets and liabilities; the length of the marriage; evidence of domestic violence; the age and health of the parties; tax consequences; and the balancing of the hardships. It found that some of these factors weighed against an award of attorney fees to Bette and others were neutral. But the decisive difference in the parties' circumstances, according to the court, was that Westcot separately owned the Wilshire property, valued at over $10 million, while Bette had "few assets that can be readily liquidated." The court also found that Westcot used the value

24

of the Wilshire property to prevent Bette from enforcing her rights under the 2008 agreement, causing her to incur significant attorney fees.

Westcot argues that the record does not suggest any disparity in wealth because he is required to share all income from the Wilshire property with Bette. We agree. Although the family court considered the parties' circumstances, it proceeded on the assumption that the Wilshire property was Westcot's alone, without acknowledging the parties' actual economic reality under the 2008 agreement and the court's own proposed plan for funding their litigation costs.

At oral argument on Bette's motion to sell the Wilshire property and divide the proceeds, the family court questioned whether Westcot had to share those proceeds with Bette. But as Bette points out, the court denied the motion without making a finding on that issue. Because the court did not order the sale of the property and made no finding whether the proceeds from any sale would be income under the 2008 agreement, the issue is not before us. In any case, the court's award of need-based fees to Bette appears arbitrary and unjustified.

Assuming hypothetically that Westcot must share proceeds from the sale of the Wilshire property with Bette, there would be no difference in the parties' actual wealth, since the Wilshire property would be Westcot's separate property in name only. Assuming he need not share the sale proceeds with Bette, there is no evidence Westcot can sell the property to fund the litigation. It is highly unlikely that Bette would consent to a sale of the parties' main source of income if she could not share in the proceeds of the sale, and the family court indicated that it would not order the property sold. Rather, the court offered the parties an alternative sequence of options to cover attorney fees and costs: the renegotiation of the lease on the Wilshire property, followed by the sale of the British West Indies and Palos Verdes properties, and borrowing against the Wilshire property as a last resort. Under either hypothetical scenario, Westcot would have no realistic access to any more funds than Bette.

We reverse the need-based award of attorney fees to Bette and remand for its redetermination in light of the parties' actual economic reality and other relevant factors.

25

We note that the doctrine of judicial estoppel precludes a party from taking inconsistent positions over the course of judicial proceedings. (*The Swahn Group, Inc. v. Segal* (2010) 183 Cal.App.4th 831, 841.) Thus, Bette may not argue the parties have unequal assets in order to obtain need-based attorney fees and also assert a right to share equally in the proceeds from any sale of the Wilshire property.

Westcot contends the court should have ordered the parties to liquidate their properties to pay their attorney fees, and he argues that we should require it to do so on remand. While section 2032, subdivision (c) gives the court the power to "order payment of an award of attorney's fees and costs from any type of property," it does not require it to exercise that power in any particular fashion. The parties could avoid additional costly proceedings by agreeing to the sequence of options the family court laid out for them, or if they fail to agree either party could take steps to enforce the judgment, as the court suggested. Our only concern is that the court's ruling on attorney fees be consistent with its proposed plan for funding the litigation.

### B. Fees and Sanctions for Breach of Fiduciary Duties

Each spouse owes the other fiduciary duties in the management and control of their community assets and liabilities until they are divided by the parties or the court. (§ 1100, subd. (e).)[9] One spouse has a claim against the other for any breach of fiduciary duty resulting in "impairment to the claimant spouse's present undivided one-half interest in the community estate." (§ 1101, subd. (a).) "Remedies for breach of the fiduciary duty by one spouse . . . shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs." (§ 1101, subd. (g).) An award of 100 percent of an undisclosed or transferred asset is allowed on a finding of fraud, oppression or malice. (§ 1101, subd. (h); *In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 42.)

---

[9] The parties do not challenge the family court's conclusion that they owed each other fiduciary duties under the 2008 agreement.

*1. Westcot*

The judgment requires Westcot to pay Bette $15,000 for breach of his fiduciary duties, $46,915 for Acosta's accounting, and Acosta's entire expert witness fee at trial. The judgment separately requires him to pay Bette $170,650.80 in attorney fees and costs for his breach of fiduciary duties. As Bette acknowledges, the most obvious problem is that the $15,000 and $46,915 amounts are included in the $170,650.80 total; hence, they are awarded twice.

More fundamentally, however, Westcot contends that the award under section 1101, subdivision (g) is flawed because Bette has not shown a breach of fiduciary duty that has actually impaired her half-interest in community property. Bette responds that section 1101, subdivision (g) contains no such requirement, citing *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 348 for the proposition that "[o]nce a breach is shown, the trial court lacks discretion to deny an aggrieved spouse's request for attorney fees."

Bette's position is untenable. Statutory interpretation begins with the language of the statute, and if the language is clear and unambiguous, it ends there. (*In re Marriage of Fossum, supra,* 192 Cal.App.4th 336, 347–348.) The clear language of section 1101, subdivision (a) allows a claim only if one spouse's breach of fiduciary duty causes an impairment of the other spouse's existing half-interest in community property. *In re Marriage of Fossum* is not to the contrary. There, the husband was reimbursed for 50 percent of the wife's undisclosed credit card debt incurred before separation, but was not awarded attorney fees. (*Id*. at p. 347.) On appeal, the court held that an attorney fee award was mandatory under section 1101, subdivision (g), once breach was shown. (*Id*. at p. 348.) But the breach referenced in subdivision (g), a remedy provision, cannot be different from the breach referenced in subdivision (a), which allows a claim for the breach in the first place. The two subdivisions must be read together as allowing a claim and a remedy only for a breach that impairs the complaining spouse's present half-interest in community property. (See *Los Angeles Unified School Dist. v. Garcia* (2013) 58 Cal.4th 175, 193 [statutory provisions must be read together rather than in isolation].)

27

To be reimbursed for 50 percent of the debt, the husband in *In re Marriage of Fossum* must have established that the debt impaired his half-interest in community property.

Here, Westcott was charged with four breaches: (1) incurring undisclosed credit card debt before the 2008 agreement; (2) transferring $10,000 to his granddaughter about the time of the spouses' separation; (3) not making deposits into the joint account and not cooperating with the accounting; and (4) creating an estate plan contrary to the terms of the 2008 agreement.

As to the first breach, unlike in *In re Marriage of Fossum*, *supra*, 192 Cal.App.4th 336, the family court in this case did not reimburse Bette for her 50 percent share of Westcot's debt; rather, the court found that credit card debt incurred after August 2006 was Westcot's separate obligation under the 2008 agreement. Westcot does not contest this finding. But he argues, and we agree, that Bette's half-interest in community assets and liabilities could not have been impaired by his separate credit card debt. Similarly, as to the fourth breach, Westcot's failure to create an estate plan compliant with the 2008 agreement did not impair Bette's existing half-interest in community property since Westcot was required to transfer only his own half-interest in community property and his separate property. The court's award of $11,346 in estate and trust attorney fees to Bette was, thus, unjustified and must be reversed.

As to the third breach, the court found that Westcot's failure to deposit his income into the joint account and cooperate with the accounting required Bette to retain an accountant to show how payments should have been made under the agreement and how Westcot had failed to cooperate. It, therefore, awarded Bette all fees she incurred in relation to Acosta's accounting and testimony. This award also must be reversed. To the extent the parties agreed to account for their expenses retroactive to 2006, an accounting for the period predating the agreement could not have been occasioned by any breach of fiduciary duty under the 2008 agreement. Rather, the agreement envisions, and the parties' attorneys agreed, that each party will separately account for his or her income and spending. Harik testified she sent her accounting on behalf of Westcot to Bette's counsel and to Acosta for use as a basis for the forensic accounting. There is no

28

substantial evidence that Acosta's accounting was occasioned by Westcot's lack of cooperation or breach of fiduciary duty.  Nor can Westcot be faulted for Anfuso's non-compliant reimbursement analysis if Acosta's analysis did not comply with the 2008 agreement either.

The court also awarded Bette $5,000 for additional bookkeeping fees Harik charged due to Westcot's perceived lack of cooperation.  Harik testified the additional fees were incurred because of Westcot's improper claims for reimbursement for personal expenses disallowed under the 2008 agreement, such as those incident to his living on the Palos Verdes property.  While the record supports the conclusion that Westcot's communications with the bookkeeper (or rather his daughter's communications on his behalf) may have been excessive and unnecessarily contentious, it is less clear that they rise to a breach of fiduciary duty that impaired Bette's half-interest in community property in the awarded amount.  Harik testified that the communications she received from the office of Bette's attorney probably equaled those she received from Westcot's daughter.  If Acosta's flawed reimbursement analysis is any indication, both parties were equally confused about their right to reimbursement under the 2008 agreement since Accosta treated Bette's personal expenses incident to her living on the Palos Verdes property as payments for specified purposes.  Even were Harik's additional fees to be considered the result of a breach that impaired Bette's half-community interest, under section 1101, subdivision (g) Bette would be entitled to reimbursement for only one-half of the bookkeeper's fees charged on the joint account, or $2,500.

Generally, a spouse may not gift community personal property without the written consent of the other spouse.  (§ 1100.)  Westcot admitted he gifted $10,000 to his granddaughter without Bette's knowledge.  But he did not admit that he gifted away community property, and the court did not make such a finding before it awarded Bette the entire amount of the gift.  The court's finding that the gift was made in August 2008 misstates the testimony of the couple's daughter, who thought several checks were written to the granddaughter before that date, and even before the signing of the settlement agreement.  The parties' accounting confirms that monetary gifts were made to

29

the granddaughter between February 2007 and May 2008, some of which Bette claimed as an unspecified community expense. Assuming Westcot made the $10,000 gift he admitted to, it is unclear why a gift predating the 2008 agreement should be treated differently from other unspecified expenses for which the parties agreed to reimburse each other, regardless of the type or expense or the source of payment. If, as the court found, the gift postdates the agreement, it is unclear that it was improperly made from the joint account or from income that should have been, but was not, deposited in that account—the only two reasons to find a breach of a fiduciary duty with respect to spending community income under the agreement. The evidence does not clearly support a finding that the gifted amount was of community property; even if there were such evidence, Bette would be entitled to no more than 50 percent of that amount, or $5,000, under either the 2008 agreement or section 1101, subdivision (g).

The parties' dispute was mainly occasioned by Westcot's refusal to share his income with Bette. Bette complained he refused to deposit all his income into the joint account after signing the 2008 agreement, and she insisted that she filed for divorce because of that. In addition, Harik testified that on several occasions during her management of the joint account in 2009, Westcot failed to deposit his pension, Social Security benefits, and oil royalties into the account. Westcot argues that he had no legal obligation to share his Social Security benefits, citing our decision in *Stone I*, *supra*, B239097. However, in the prior appeal, he challenged only the pooling of those benefits post-divorce, and that is the scope of our holding in *Stone I*. (*Id.* at p. 28.) Westcot claims further that despite any income he withheld, Bette always was paid her full share. Because he fails to cite to any place in the record supporting that claim, we do not accept it. (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743 [lack of adequate citation to record forfeits claim of error].)

Acosta calculated the income Bette should have received between August 2006 and December 2009 by dividing equally the parties' total income as reported on their income tax returns, but she did not calculate Bette's claim for reimbursement for one-half of any income Westcot withheld from the joint account, under either the 2008 agreement

30

or section 1101, subdivision (g). Thus, it is not clear from Acosta's analysis whether Bette is entitled to reimbursement for one-half of any withheld income, or the amount of any such reimbursement. Since we remand the case for a redetermination of each party's entitlement to reimbursement for one-half of the other's unspecified expenses under the 2008 agreement, it is for the family court to consider whether Bette should be reimbursed for one-half of any withheld income under section 1101, subdivision (g), based on a reconciliation of the parties' accountings.

The court awarded Bette $87,588.80 in attorney fees and costs for her pursuit of all her claims for breach of fiduciary duty, and an additional $9,800 in attorney fees for her earlier attempt to enforce the 2008 agreement. To the extent the attorney fee award is based on the court's incorrect determination of what constituted qualifying breaches and its incorrect reimbursement analysis, it also is infirm. We remand the matter for redetermination of the remedies to which Bette may be entitled for breaches of fiduciary duty that actually impaired her existing half-interest in community property under section 1101, subdivision (g).

2. *Bette*

Bette challenges the award of $250,000, plus attorney fees, to Westcot for her failure to consent to the renegotiation of the ground lease on the Wilshire property. We agree with Bette that the award should be reversed for lack of substantial evidence that she breached her fiduciary duty causing damages to the community that would entitle Westcot to relief under section 1101.

Under the existing ground lease, the lessor will receive six percent of the gross income from the commercial office building on the Wilshire property until 2032. At the end of the lease, the building would revert to the lessor. By the time of trial, the building had been bought by a syndicate, 9300 Wilshire Building, LLC, which was interested in renegotiating the lease. Frederick Nicholas was involved in the negotiation on Westcot's behalf. Nicholas testified Westcot had contacted him about the lease renegotiation in February or March 2010. Nicholas informed Bette and her attorney of the negotiations in April 2010 and promised to have something ready for their approval in a "couple of

31

months." Bette was happy about his involvement in the negotiation. At the time of Nicholas's testimony in June 2010, there was a written offer by the lessee for an extension of the ground lease from 2032 to 2075 in exchange for an upfront $500,000 payment to the Stones and an increase in the percentage of rental payments. Nicholas was prepared to make a counter-offer for a greater increase in the percentage of rent and a reduction of the lease extension to 2070, and he believed that a final agreement could be reached the following week. He had given a copy of the offer to Bette's attorney, but had not heard back from him.

Two months after Nicholas's testimony, Bette testified she did not trust Westcot because he had "lied throughout the whole thing," but she had welcomed Nicholas's involvement in the renegotiation and was willing to agree to a proposal that would be acceptable to all parties to the 2008 agreement. Bette also testified she did not believe the proposal Nicholas had negotiated was reasonable because there would not be "anything left of the property for the children," but she was confused about the terms of the proposal and said that she would need to see "the full thing" before she could decide whether to give her consent.

Two months later, in October 2010, Bette's attorney advised the court that the ground lease had been sold to Hudson Pacific Property, and he asked that Westcot be precluded from negotiating an extension of the lease without Bette's informed consent. The attorney also stated his belief that a lease extension would adversely affect the reversionary interest in the property and would upset the 2008 agreement; counsel did not believe the lease should be renegotiated as part of the divorce proceeding because the children were parties to the 2008 agreement and their consent was necessary for any encumbrance on the property. Over objection, the attorney was allowed to state that the couple's son, who did not testify at trial, was opposed to any renegotiation of the lease.

The couple's daughter then testified that she was not opposed to the lease extension because receiving a lump sum for it was in her parents' interest, and because, by the time the lease expired in 2032, she would be too old to care about her reversionary interest in the property. She also testified that she and her father had discussed an

32

extension of the lease with the new lessee, and that the lessee was interested in offering between $500,000 and $750,000 for an extension, but had not yet made a formal offer.

The court concluded the community could have benefitted from the $500,000 cash advance had the lease been renegotiated. The court cited the non-opposition to the lease extension by the parties' daughter and discounted the son's opposition since he had not testified at trial. The court awarded Westcot $250,000, or half of the projected benefit to the community, plus attorney fees, for Bette's "failure to permit the lease re-negotiation."

The court treated Bette's request for a statement of decision on this issue as an objection to the tentative statement of decision, and denied the objection. Later, Bette's counsel asked for a clarification or correction of the tentative decision on attorney fees and costs, specifically asking the court to amend its award of $250,000 in damages "because Bette did not accept the original lease extension offer." Bette's counsel also filed a motion for reconsideration and for sale of the Wilshire property. He again conceded that Bette had rejected a "soft" offer of $500,000, and presented valuation expert reports in support of his argument that a subsequent higher offer also was not in the parties' best interest. The court rejected the reports as hearsay lacking foundation, and denied the motion for reconsideration.

Meanwhile, in support of his request for attorney fees, Westcot's counsel submitted a letter by Bette's counsel permitting Westcot to negotiate with the new lessee, as well as correspondence indicating that the couple's son had interfered with the negotiation by claiming he had an interest in the Wilshire property and was opposed to the lease extension.

In its statement of decision on attorney fees and costs, the family court denied sanctions under section 271, finding that both parties had behaved unreasonably. Specifically, the court found that Bette had unreasonably withheld her consent to the lease negotiations and that the son's intervention demonstrated that Bette continued to obstruct a final resolution of the divorce proceeding. Based on billing entries showing attorney communications with the son, the court concluded that Bette "had her son . . . very much involved in these proceedings," even though he did not appear as a witness.

33

The court premised the award against Bette on her general "failure to permit the lease re-negotiation," rather than on a particular act on her part. Bette argues, and we agree, that there is no evidence supporting an inference that she failed to permit a renegotiation of the lease. The evidence at trial showed that a renegotiation had been in process, a non-final offer had been made and shown to Bette's attorney, Bette was concerned about its effect on the children's rights to the property, and she wanted to see a final offer in order to decide whether to agree to it. The lease was then sold to a new lessee for reasons that do not appear in the record, and the new lessee expressed an interest in extending it. There was no evidence before the family court that Bette had prevented the negotiations of the lease extension, or that she had rejected an offer all other parties to the 2008 agreement had been willing to accept.

Representations made by Bette's attorney after trial suggest that Bette rejected the "soft" offer Nicholas proposed on behalf of the original lessee, and Westcot argues that the family court implicitly found that had Bette consented, the deal would have been completed. Even accepting Bette's concession that she rejected a non-final offer by the original lessee, it would be speculative to conclude that the extension of the lease fell through because of her. It also would be speculative to conclude that had Bette agreed to the "soft" offer, the parties' son would have fallen in line without evidence that she was able to control his decisions.

More fundamentally, Westcot has failed to show that Bette's failure to agree to the lease extension has impaired his present half-interest in community property, as required under section 1101. Even viewed in a light most favorable to Westcot, the record shows no more than Bette's unwillingness to agree to a business opportunity that could have potentially benefitted the community. It does not show that she impaired the community's existing interest in rental income from the Wilshire property.

Notably, section 2102 governs the spouses' fiduciary duties with regard to an "income-producing opportunity that presents itself after the date of separation, but that results from any . . . income-producing opportunity of either spouse from the date of marriage to the date of separation." All that section requires is a written disclosure of the

34

opportunity "in sufficient time for the other spouse to make an informed decision as to whether he or she desires to participate . . . , and for the court to resolve any dispute regarding the right of the other spouse to participate in the opportunity." (§ 2102, subd. (a)(2).) Nothing in section 2102 suggests that one spouse's unwillingness to agree to an income-producing opportunity pursued by the other spouse amounts to a breach of fiduciary duty that actually impairs the latter spouse's present undivided half-interest in community property.

Thus, regardless of whether Bette has breached a duty to Westcot under the 2008 agreement by withholding her consent to the lease extension and regardless of any other relief that may be available to him, he is not entitled to the remedies in section 1101, subdivision (g). The award of damages and attorney fees and costs under that section against Bette is reversed.

## DISPOSITION

The reimbursement award to Bette under the 2008 agreement is reversed, as is the award to her of attorney fees under section 2030 and damages, attorney fees, and costs under section 1101, subdivision (g). The matter is remanded for a redetermination of these awards, an accounting of any post-divorce pooling of Social Security benefits, and an adjusted equalization payment. The award of remedies to Westcot under section 1101, subdivision (g) is reversed. The judgment is modified to provide that the parties need not deposit their Social Security benefits into the joint account after the divorce, and affirmed in all other respects.

Each party is to bear his or her own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:



WILLHITE, J.                                    COLLINS, J.

35